UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                                        )
DAVID P. JACOBSEN, et al.,            )
                                                        )
        Plaintiffs,                              )
                                                        )
        v.                                          )   Civil Action No. 01-1810 (PLF)
                                                        )
JAMES J. OLIVER, et al.,               )
                                                        )
        Defendants.                          )
_____)


OPINION

        This legal malpractice lawsuit arises out of the successful representation of

plaintiff David Jacobsen by his former attorneys, James J. Oliver, Carla E. Connor, and Barbara

A. Barnes, and their law firm, Murphy Oliver Caiola & Gowen, P.C. (collectively "defendants"),

in two actions against the Islamic Republic of Iran.  Jacobsen sued Iran in this Court, alleging

that it had provided material support and resources to the terrorists who kidnaped him in Beirut,

Lebanon in May 1985 and held him captive for 532 days.  After Iran failed to appear, through

counsel or otherwise, Judge Thomas Penfield Jackson entered a default judgment in favor of

Jacobsen on August 27, 1998 awarding him nine million dollars in compensatory damages.

Jacobsen recovered the judgment in full after Congress passed legislation in 2000 that permitted

hostage victims who had secured judgments prior to July 20, 2000, to recover all of their

compensatory damages.  Dissatisfied with this recovery, Jacobsen brought this suit, claiming that

the defendants committed legal malpractice by not seeking punitive damages and that the

defendants' 35 per cent contingent fee was unreasonable and excessive.

Jacobsen faults the defendants for failing to seek an award of punitive damages under either of two separate theories that he contends were available during the pendency of his lawsuit before Judge Jackson.  First, according to Jacobsen, defendants erred by not advising him to add the Iranian Ministry of Information and Security ("MOIS") as an additional defendant in his suit.  According to Jacobsen, MOIS was an "agency or instrumentality" of the Iranian government that was subject to punitive damages under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1601, et seq.  The failure to add MOIS as a defendant allegedly precluded Jacobsen from receiving substantial punitive damages.  Second, Jacobsen claims that punitive damages also would have been recoverable had defendants moved under Rule 60(b) of the Federal Rules of Civil Procedure to set aside his nine million dollar judgment and seek recovery under an amendment to the FSIA enacted by Congress on October 21, 1998, which authorized the award of punitive damages against foreign sovereigns.  According to this theory, defendants' negligent representation of Jacobsen foreclosed an opportunity for Jacobsen to recover punitive damages directly against Iran in addition to the compensatory damages he was awarded.  Both theories of damages arising from defendants' alleged legal malpractice rest on the ability of Jacobsen to collect punitive damages for his injuries in the underlying action.

Defendants filed three separate motions for summary judgment under Rule 56 of the Federal Rules of Civil Procedure.  The first two motions separately attack Jacobsen's alternative theories for recovering punitive damages, arguing that (1) the ability to recover punitive damages against Iran under the October 21, 1998 amendment to the FSIA was precluded by President Clinton's executive waiver of the punitive damages provision; and (2) MOIS was not subject to punitive damages, as it was neither an "agency" nor an

"instrumentality" of Iran but rather the state itself.  Defendants' final motion offers broader

defenses against the entire malpractice claim.

On March 30, 2006, this Court entered an order granting defendants' partial

motions for summary judgment on both of plaintiff's legal malpractice claims.  Defendants'

third motion for summary judgment was denied as moot, except with respect to the issue of

excessive fees, which was denied without prejudice.[1]  The reasoning underlying the Court's

March 30, 2006 order is set forth in this opinion.

## I.  BACKGROUND

Many of the facts relevant to the disposition of this case were detailed in an

earlier opinion issued in this case by Judge Ellen Segal Huvelle:

> This lawsuit traces back to events in [Lebanon], when in
> 1985 the terrorist organization, the Hezbollah, abducted David
> Jacobsen along with Terry Anderson, Thomas Sutherland and
> Reverend Lawrence Jenco.  The Hezbollah held Jacobsen as a
> hostage for 532 days until November 2, 1986.  In 1992, Jacobsen
> and another former hostage, Joseph Cicippio, and his wife engaged
> defendant James Oliver and his law firm to pursue legal remedies
> for their injuries and losses caused by the Hezbollah's actions.  At
> the time, the availability of legal remedies was problematical,
> because the [FSIA] granted immunity from lawsuits to foreign
> states with only limited exceptions.  Nonetheless, defendants
> brought suit in this Court in October 1992 on behalf of Jacobsen,
> Cicippio, and Cicippio's wife against the Islamic Republic of Iran
> under the FSIA.  Cicippio v. Islamic Republic of Iran, No.
> 92–cv–2300 (D.D.C. 1992) (hereinafter "Cicippio I").  In 1993,
> Judge Jackson dismissed the suit without prejudice, concluding
> that defendants had not presented a viable legal claim under the
> FSIA.  Cicippio v. Islamic Republic of Iran, 1993 WL 730748
> (D.D.C. 1993), aff'd, 30 F.3d 164 (D.C. Cir. 1994), cert. denied,
> 513 U.S. 1078, 115 S.Ct. 726, 130 L.Ed.2d 631 (1995).

---

[1]      The Court's March 30, 2006 order also denied as moot defendant's motion to exclude the
testimony of David N. Webster, Esq. and plaintiff's motion in limine to exclude the testimony of
Michael Kessler.

Subsequent to this dismissal, Jacobsen and defendants actively lobbied Congress and the Clinton administration to pass legislation that would allow for lawsuits against foreign states that sponsored terrorism.  Ultimately, these efforts were successful.  In April 1996, Congress passed the Anti–Terrorism and Effective Death Penalty Act of 1996 (hereinafter "AEDPA"), Pub.L.No. 104–132, codified at 28 U.S.C. § 1605(a)(7), which amended the FSIA to allow for lawsuits against foreign states that sponsor terrorism. Jacobsen then signed a second engagement letter, and in July 1996, defendants refiled their suit against Iran on behalf of Jacobsen, Cicippio and his wife, and former hostage Frank Reed and his wife (hereinafter "Cicippio II").  The complaint sought compensatory damages of $100 million plus punitive damages against Iran only, but did not name any "agents or instrumentalities" of Iran.

Subsequent to the filing of Cicippio II, in September 1996, Congress enacted the "Flatow Amendment". . . .  See Civil Liability for Acts of State Sponsored Terrorism Act, Pub.L.No. 104–208 § 589, codified at 28 U.S.C. § 1605 note [hereinafter "Flatow Amendment"].  The Amendment provided in relevant part:

> (a) An official, employee, or agent of a foreign state designated as a state sponsor of terrorism designated under section 6(j) of the Export Administration Act of 1979 [section 2405(j) of the Appendix to Title 50, War and National Defense] while acting within the scope of his or her office, employment, or agency shall be liable to a United States national or the national's legal representative for personal injury or death caused by acts of that official, employee, or agent for which the courts of the United States may maintain jurisdiction under section 1605(a)(7) of title 28, United States Code [subsec. (a)(7) of this section] for money damages which may include economic damages, solatium, pain, and suffering, and punitive damages if the acts were among those described in section 1605(a)(7) [subsec. (a)(7) of this section].

The Flatow Amendment expressly provided victims of terrorism with a statutory basis for pursuing legal actions directly against agents and instrumentalities of Iran. . . .

> In Cicippio II, Iran did not appear to contest the claims, and
> in November 1997, Judge Jackson entered a default and agreed to
> schedule individual trials for each of the Cicippio II plaintiffs.
> Prior to Jacobsen's trial, the Honorable Royce C. Lamberth issued
> his ruling in Flatow v. Islamic Republic of Iran, in which he held
> that the Flatow Amendment allowed for punitive damages to be
> collected directly from a foreign state . . . .  Disagreeing with
> Flatow, Judge Jackson ruled that the FSIA precluded an award of
> punitive damages against a foreign state, but he offered the
> Cicippio plaintiffs an opportunity to delay the trial so as to amend
> their complaint to name agents or instrumentalities.

Jacobsen v. Oliver, 201 F. Supp. 2d 93, 96-97 (D.D.C. 2002).

Jacobsen and defendants present different versions of how Judge Jackson's offer

of a delay in the trial to permit an amendment to the complaint was considered.  See Defendants'

Motion for Summary Judgment (9/25/03) ("Mot. S.J. (9/25/03)") at 7; Plaintiff's Memorandum

in Opposition to Defendants' Motion for Summary Judgment (11/28/03)  ("Opp. Mot. S.J.

(11/28/03)") at 4-7.  It is agreed, however, that Jacobsen and his co-plaintiffs declined to amend

their complaint to add MOIS as a defendant in their suit and instead withdrew their claims for

punitive damages against Iran.

On August 27, 1998, Judge Jackson awarded Jacobsen compensatory damages

against Iran in the amount of nine million dollars.  Cicippio v. Islamic Republic of Iran, 18 F.

Supp. 2d 62, 70 (D.D.C. 1998).  Jacobsen was insulted by the size of the judgment.  See

Jacobsen Dep. 341; Mot. S.J. (9/25/03), Ex. 27 (Letter from Jacobsen to Oliver dated 9/28/98).

Before trial, he believed that he was "looking at a potential individual award[] somewhere

between $85 million and $250 million."  Mot. S.J. (9/25/03), Ex. 11 (Fax from Jacobsen to

Oliver dated 5/18/98).  In addition, Judge Jackson's award of compensatory damages to

Jacobsen was about half the amount awarded to either Reed or Cicippio.  Cicippio v. Islamic

Republic of Iran, 18 F. Supp. 2d at 70 (awarding damages of $16 million to Reed and $20

million to Cicippio).  In response, Jacobsen demanded that defendant Oliver check with Judge

Jackson's chambers to see whether a clerical error had been made and, later, whether the error

was arithmetic.  See Oliver Dep. 515, 517-18, 522-24.  Although disappointed, Jacobsen directed

his efforts at trying to collect the award.

Two months after the Cicippio II judgment was entered, Congress adopted by

rider to a Treasury Department appropriations bill an amendment to Section 1606 of FSIA

permitting punitive damages against state sponsors of terrorism in actions brought under

Section 1605(a)(7) or Section 1610(f).  See Pub.L. 105-277, Div. A, § 101(h) [Title I, § 117(b)]

(the "October 1998 Amendment").  The rider also included a provision sought by the State

Department empowering the President to waive the requirements of the rider in the interests of

national security.  See id. at § 117(d).  President Clinton exercised this waiver immediately,

waiving the "requirements of this provision" through a Presidential Determination.  See Pres.

Determination No. 99-1, 63 Fed. Reg. 59201 (1998) (the "1998 Presidential Waiver").  After this

legislation was enacted, the Cicippio II plaintiffs and defendant Oliver held a telephone

conference call.  Defendants contend that at that time the parties discussed whether to apply

anew to Judge Jackson for an award of punitive damages against Iran, but ultimately decided to

forge ahead with efforts to collect the judgments they already had been awarded.  See

Defendants' Motion for Partial Summary Judgment (12/13/02)  ("Mot. Part. S.J. I (12/13/02)") at

8-9.  Jacobsen claims not to remember the content of the conversation, although he admits it

took place.  See Jacobsen Dep. 315-16.  Jacobsen previously had expressed concerns about a

delay in the trial date, possibly related to his desire to resolve the lawsuit and collect the

judgment quickly.  See Mot. S.J. (9/25/03), Ex. 8 (Fax from Jacobsen to Wallenberg Center

dated 7/10/98).

For whatever reason, the Cicippio II plaintiffs did not file a Rule 60(b) motion and instead proceeded with efforts to collect their judgments.  Many of these efforts were directed at Congress and the executive branch.  See, e.g., Mot. S.J. (9/25/03), Ex. 14 (Letter from Jacobsen to President Clinton dated 10/16/98), Ex. 15 (Letter from Jacobsen to Congressman Duncan Hunter dated 2/3/99), Ex. 16 (Letter from Jacobsen to State Department dated 10/27/98), Ex. 17 (Fax from Jacobsen to Senator Feinstein dated 3/17/99).  Eventually, these efforts bore fruit.  As Judge Huvelle explained:

> On October 28, 2000, the Victims of Trafficking and Violence Protection Act of 2000 became law.  See Pub.L.No. 106–386, 114 Stat. 1541 (2000).  It established procedures for collecting on judgments against terrorist states by allowing a victim of terrorism, who held, as of July 20, 2000, a final judgment against a terrorist state to receive compensation directly from the United States government.  Section 2002(a)(1)(A) of the Act permitted a victim of terrorism to collect "110 percent of compensatory damages" provided he or she "relinquish all rights and claims to punitive damages," and section 2002(a)(1)(B) allowed compensation of "100 percent of compensatory damages," but permitted a victim to continue to pursue the recovery of punitive damages that had been awarded.  See Flatow v. Islamic Republic of Iran, 201 F.R.D. 5, 10–11 (D.D.C.2001).

Jacobsen v. Oliver, 201 F. Supp. 2d at 98.

This legislation, however, did not resolve Jacobsen's legal issues.  As the passage of the legislation approached, Jacobsen sent defendant Oliver a letter terminating his and his firm's services.  See Mot. S.J. (9/25/03), Ex. 20.  Clearly, Jacobsen was upset with the quality and results of the representation.  See id., Ex. 22 (Letter from Jacobsen to Judge Jackson dated 10/8/00) (requesting the judge to issue sanctions against defendant Oliver for failing to sign a separation agreement).  Defendants responded by petitioning for a charging lien, which Judge Jackson awarded on October 12, 2000.  See Order, Cicippio II, No. 1:96-CV-01805 (10/12/2000); Mot. S.J. (9/25/03), Ex. 25.  Nonetheless, pursuant to Section 2002(a)(1)(B) of the

Victims of Trafficking and Violence Protection Act of 2000 ("VTVPA"), Jacobsen recovered

100 percent of his nine million dollar judgment on December 22, 2000.  See Mot. S.J. (9/25/03)

at 10.  Notably, had Jacobsen sought and been awarded punitive damages in Cicippio II and

relinquished those claims under Section 2002(a)(1)(A), he would have received an additional

$900,000 from the federal treasury.

Jacobsen brought this legal malpractice action in this Court pursuant to its

diversity jurisdiction under 28 U.S.C. § 1332(a)(1).  Before the case was randomly reassigned to

the undersigned, Judge Huvelle dismissed claims on behalf of Jacobsen's children on April 29,

2002, holding those claims to be time-barred.  See Jacobsen v. Oliver, 201 F.2d at 96.  Jacobsen

filed an amended complaint without those claims on August 16, 2002.  See Amended Complaint.

## II. DISCUSSION

### A. Legal Standard

All three of defendants' motions are before the Court on summary judgment

pursuant to Rule 56 of the Federal Rules of Civil Procedure.  Summary judgment may be granted

only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together

with the affidavits, if any, show that there is no genuine issue as to any material fact and that the

moving party is entitled to a judgment as a matter of law."  FED. R. CIV. P. 56(c); see also

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986); Holcomb v. Powell, 433 F.3d 889,

895 (D.C. Cir. 2006).  "A fact is 'material' if a dispute over it might affect the outcome of a suit

under governing law; factual disputes that are 'irrelevant or unnecessary' do not affect the

summary judgment determination."  Holcomb v. Powell, 433 F.3d at 895 (quoting Anderson v.

Liberty Lobby, Inc., 477 U.S. at 248).  An issue is genuine if the evidence is such that a

reasonable jury could return a verdict for the nonmoving party.  See Anderson v. Liberty Lobby,

<u>Inc.</u>, 477 U.S. at 248; <u>id</u>.  When a motion for summary judgment is under consideration, "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. at 255; <u>see also</u> <u>Washington Post Co. v. United States Dept. of Health and Human Services</u>, 865 F.2d 320, 325 (D.C. Cir. 1989).

### B. "Trial within a trial" framework

In an attorney malpractice action, courts must effectively undertake a "trial within a trial" or "case within a case" in order to determine the likely outcome in the underlying action. <u>See</u> <u>Rubens v. Mason</u>, 387 F.3d 183, 190 (2d Cir. 2004) ("The malpractice judge or jury must decide a 'case within a case' and determine what the result would have been [in the underlying lawsuit] absent the alleged malpractice"); <u>see also</u> SMITH & MALLEN, 4 LEGAL MALPRACTICE § 33.9 ("[P]resenting the evidence that should have been offered at the trial of the underlying action is known as a "case-within-a-case," "suit-within-a-suit" or "trial-within-a-trial." This is the accepted and traditional means of resolving the issues involved in the underlying proceeding in a legal malpractice action.").  Thus, at the summary judgment stage, the Court will consider all pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, in order to determine what "should have been" at the time of the underlying action for purposes of assessing the attorney's allegedly negligent conduct.  <u>See id</u>. ("[T]he objective of a trial-within-a-trial is to determine what the result *should have been* (an objective standard) . . . .").  The plaintiff therefore must effectively "present two cases, one showing that [his] attorney performed negligently, and a second or predicate "case within a case" showing that [he] had a meritorious claim that [he] lost due to [his] attorney's negligence." <u>Mihailovich v. Laatsch</u>, 359 F.3d 892, 905 (7th Cir. 2004).  Only by making out both cases can a plaintiff

demonstrate a "causal relationship, or proximate cause, between the violation and the harm

complained of . . . ."  See Smith v. Haden, 872 F. Supp. 1040, 1053 (D.D.C. 1994).

### C. Motion for Partial Summary Judgment on Jacobsen's "Rule 60(b)(6) Claim"

On December 13, 2002, defendants filed the first of three motions for summary

judgment.  This first motion is for partial summary judgment on Jacobsen's claim that defendant

Oliver negligently failed to file a Rule 60(b)(6) motion for relief from the final judgment entered

by Judge Jackson in Cicippio II, on the theory that if Judge Jackson had granted the Rule

60(b)(6) motion Jacobsen would have successfully pursued a claim for punitive damages against

Iran ("Rule 60(b)(6) theory").  Defendants' are entitled to summary judgment on Jacobsen's

Rule 60(b)(6) claim.

### 1.  Background

As Jacobsen concedes, his Rule 60(b)(6) theory that he is entitled to relief from

the judgment in Cicippio II is premised on a legal conclusion regarding the validity of Section

117(b) of the October 1998 Amendment and President Clinton's purportedly limited waiver

under the Amendment.  See Plaintiff Jacobsen's Statement Pursuant to Local Rule 7.1(h) [sic] of

Material Facts as to Which There Exists a Genuine Issue in Dispute at 2, 3 (addendum to

Plaintiff's Memorandum in Opposition to Defendant's Motion for Partial Summary Judgment

(1/7/03) ("Opp. Mot. Part. S.J. I (1/7/03)").  In modifying 28 U.S.C. § 1606, subsection (b) of the

October 1998 Amendment would have permitted the award of punitive damages against state

sponsors of terrorism brought under Sections 1605(a)(7) and 1610(f) of the FSIA.  See  Pub. L.

No. 105-277, § 117, 112 Stat. 2681-491; 28 U.S.C. § 1606.  Subsection (d) of the October 1998

Amendment further provided, however, that "[t]he President may waive the requirements of this

section in the interest of national security."  Pub. L. No. 105-277, § 117, 112 Stat. 2681-492.  On

October 21, 1998, President Clinton both signed the bill into law and simultaneously exercised

his wavier authority under subsection (d).  See Pres. Determination No. 99-1, 63 Fed. Reg.

59201 (1998).  While the stated rationale for the President's waiver related exclusively to

subsection (a) of Section 117, President Clinton concluded by writing, "pursuant to section

117(d), I hereby waive the requirements of section 117 in the interest of national security."  See

id.

   At the time of Oliver's allegedly negligent failure to add Iran as a defendant in

order to claim punitive damages under Section 117(b), no court had yet addressed the application

of President Clinton's waiver to Section 117(b) and no court has since squarely addressed the

question.  Thus, in order to resolve the issue as it relates to this motion, the Court must, as a

matter of law, determine the scope of the 1998 Presidential Waiver under Section 117(d) of the

October 1998 Amendment.  The plain language of the Presidential Waiver makes clear that

President Clinton intended to waive Section 117 in its entirety to the extent of the authority

granted to him by Congress in subsection (d).  See Pres. Determination No. 99-1, 63 Fed. Reg.

59201 (1998).  The question therefore is whether this authority applied only to subsection (a) or

extended also to subsection (b).

   Defendants argue that the waiver authority contained in subsection (d)

encompassed the punitive damages provision of Section 117(b).  See Mot. Part. S.J. I (12/13/02)

at 1.  If Section 117(b) was waived on the same day the bill was signed, and therefore was never

in effect, defendants argue, then Oliver was not negligent as a matter of law for his failure to file

a Rule 60(b)(6) motion because punitive damages were never available against foreign states like

Iran.  See id.  Jacobsen suggests a narrower reading of Section 117's waiver provision.  He

makes three arguments to support his assertion that the waiver authority in subsection (d) did not apply to subsection (b) of Section 117:  (1) that the language of subsection (d) is ambiguous, see Opp. Mot. Part. S.J. I (1/7/03) at 6; (2) that subsequent cases allowed punitive damages under subsection (b), see id. at 3; and (3) that extending the waiver authority in subsection (d) to subsection (b) presents a separation of powers issue that should be avoided under the doctrine of constitutional avoidance.  See id. at 12.  The Court will consider each of these arguments in turn.

### 2.  The Alleged Ambiguity of Section 117(d)

In the absence of any binding interpretation of the scope of the 1998 Presidential Waiver, the Court is faced in the first instance with a question of statutory construction.  "[A]s in all statutory construction cases, we begin with the language of the statute.  The first step 'is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case.'"  Barnhart v. Sigmon Coal Co., 534 U.S. 438, 450 (2002). Section 117(d) provides that "the President may waive the requirements of this section in the interest of national security."  Pub. L. No. 105-277, § 117(d), 112 Stat. 2681-491.  Jacobsen places significant weight on the alleged ambiguity of the word "requirements" in subsection (d), arguing that the term has a limited meaning. See Opp. Mot. Part. S.J. I (1/7/03) at 6.  This argument, if correct, would suggest that Congress did not intend to give the President waiver authority as to the entirety of Section 117, but rather only as to its "requirements."  Id.

Jacobsen points to three examples in which Congress has provided the President with the authority to waive one or more "requirements" in a statute.  See Opp. Mot. Part. S.J. I (1/7/03) at 7 (citing 22 U.S.C. § 2295a(d) ("the President may waive the requirement of paragraph (1) . . . ."); 22 U.S.C. § 2796a(a) ("[t]he President may waive the requirements of paragraph (4) . . . ."); 50 U.S.C. § 402a(c)(5) ("the President may on a case-by-case basis waive

the requirements of paragraphs (1), (2), or (3) . . . .")).  Jacobsen cites these examples to support

the proposition that "requirement" is an ambiguous term.  In the examples cited by Jacobsen,

Congress has specified precisely which "requirements" are waivable, by identifying the specific

paragraphs whose requirements are waived.  Because Congress limited the applicability of the

term "requirement" to specific paragraphs in these statutes, his argument goes, it must believe

the term is sufficiently ambiguous to require such a limitation.  By not providing one here,

Jacobsen argues, Congress has created an ambiguity.

 Jacobsen ignores the more natural inference that can be drawn from the examples

he cites.  When Congress chooses to use the term "requirements" and it wishes to limit the

term's application to specific paragraphs or subsections, it is capable of doing so.  Having not

done so in Section 117(d), the Court may infer that Congress intended no such limitation.  The

Court should not presume that Congress has used a term ambiguously.  NORMAN SINGER, 2A

STATUTES AND STATUTORY CONSTRUCTION § 46.04 (2000) ("[A]ids to interpretation can be used

only to resolve ambiguity and never to create it.").  In any event, the plain language of Section

117(d) makes such an inference unnecessary; Congress in fact *explicitly* extended the authority

of the Presidential waiver provision to "this section," not just the waiver of a particular

subsection, paragraph or provision.  See Pub. L. No. 105-277, § 117(d), 112 Stat. 2681-491.

Thus, even if the Court were to accept Jacobsen's reasoning that "requirements" must be

attended by a limiting modifier, it would still lead to the conclusion that Congress intended

"requirement" to extend to all parts of "this section," that is, Section 117.

 Subsequent developments reinforce the Court's conclusion.  On October 28,

2000, Congress passed the VTVPA, which repealed Section 117(b) and (d) of the October 1998

Amendment and modified 28 U.S.C. § 1610(f).  See Pub. L. No. 106-386, § 2002, 114 Stat.

1541.[2]  President Clinton signed the VTVPA and again immediately waived it pursuant to the

authority granted in its waiver provision.  See Id. at § 2002(f).  In exercising *this* waiver,

President Clinton clarified what he believed to be the scope of his earlier 1998 waiver:

> I hereby waive subsection (f)(1) of section 1610 of title 28, United
> States Code, in the interest of national security.  This waiver,
> together with the amendment of subsection (f)(2) of the Foreign
> Sovereign Immunities Act and the repeal of the subsection (b) of
> section 117 of the treasury and General Government
> Appropriations  Act, 1999, *supersedes my prior waiver of the*
> *requirements of subsections (a) and (b) of said section 117*,
> executed on October 21, 1998.

Pres. Determination No. 2001-03, 65 Fed. Reg. 66483 (2000) (emphasis added).  Thus, when

President Clinton waived the VTVPA in 2000, he was explicit about his belief that his 1998

waiver had applied to Section 117(b) of the October Amendment as well as to Section 117(a).

Jacobsen ignores this aspect of the VTVPA's passage and waiver in 2000 and

instead suggests that the VTVPA's waiver provision supports his argument that the initial

formulation of Section 117(d) was ambiguous.  See Opp. Mot. Part. S.J. I (1/7/03) at 6.  He

argues that the VTVPA's revised waiver – which applied only to "any provision of paragraph

---

[2]       The VTVPA reads in relevant part:

> (f) Amendments--(1) Section 1610(f) of title 28, United States
> Code, is amended--
>
> (A) in paragraphs (2)(A) and (2)(B)(ii), by striking "shall" each
> place it appears and inserting "should make every effort to"; and
>
> (B) by adding at the end the following new paragraph:
>
> "(3) Waiver.-- The President may waive any provision of
> paragraph (1) in the interest of national security.".
>
> (2) Subsections (b) and (d) of section 117 of the Treasury
> Department Appropriations Act, 1999 (as contained in section
> 101(h) of Public Law 105-277) are repealed.

Pub. L. No. 106-386, § 2002, 114 Stat. 1541.

(1)" – amounts to an acknowledgment that the initial waiver provision in Section 117(d) of the

October 1998 Amendment was ambiguous.  <u>See</u> Pub. L. No. 106-386, § 2002, 114 Stat. 1541; <u>id</u>.

Jacobsen argues in effect that, had the original waiver provision been unambiguous, Congress

would have had no need to alter it in the VTVPA.  But this conclusion simply does not follow.

The October 1998 Amendment required that "the Secretary of the Treasury and the Secretary of

State *shall* fully, promptly, and effectively assist any judgment creditor or any court that has

issued any such judgment in identifying, locating, and executing against the property of that

foreign state or any agency or instrumentality of such state."  Pub. L. No. 105-277, § 117(a), 112

Stat. 2681-491 (emphasis added).  It also required that "in providing such assistance, the

Secretaries . . . *shall* provide the information in a manner sufficient to allow the court to direct

the United States Marshal's Office to promptly and effectively execute against that property."

<u>Id</u>. (emphasis added).  The VTVPA modified both of these sections substantially and, as a result,

the VTVPA bore little resemblance to the October 1998 Amendment.  The VTVPA was a

different bill that required a different waiver.

        The VTVPA replaced "shall" with "should make every effort to" in both

subsections, thereby rendering paragraph (f)(2) of Section 117 discretionary.  <u>See</u> Pub. L. No.

106-386, § 2002, 114 Stat. 1541.  As modified by the VTVPA, paragraph (2) of Section 117(a)

no longer *required* anything of the executive branch, and therefore no longer threatened to

impinge on the President's foreign affairs powers.  <u>See id</u>.  In essence, the discretionary nature of

revised paragraph (2) was the equivalent of a waiver, since the Secretary of the Treasury and the

Secretary of State were no longer required to act under its authority.  This interpretation is

consistent with President Clinton's contemporaneous reading of the VTVPA.  He noted:  "This

waiver [of paragraph 1], *together with the amendment of section (f)(2)* . . . supersedes my prior

waiver . . . ."  Pres. Determination No. 2001-03, 65 Fed. Reg. 66483 (2000) (emphasis added).

With subsections (b) and (d) repealed, and paragraph (2) of subsection (a) rendered

discretionary, the VTVPA's waiver provision acknowledged nothing more than that paragraph

(1) was all that remained of the October 1998 Amendment.

       3.  Case Law Concerning Punitive Damages under Section 117(d)

      Jacobsen draws support for his ambiguity argument in large part from Judge

King's opinion in Alejandre v. Republic of Cuba, 42 F. Supp. 2d 1317 (S.D. Fla. 1999), rev'd on

other grounds sub nom Alejandre v. Telefonica Larga Distancia de Puerto Rico, Inc., 183 F.3d

1277, 1279 n.1 (11th Cir. 1999); see also Opp. Mot. S.J. I (1/7/03) at 3, 6.  In Alejandre, Judge

King concluded that the Presidential waiver authority in Section 117(d) applied only to

paragraph (f)(2) of the proposed amendment to 28 U.S.C. § 1610.  In Judge King's analysis,

Section 117(b) – the punitive damages provision – thus remained in effect.  See Alejandre v.

Republic of Cuba, 42 F. Supp. 2d at 1331.  In reaching this conclusion, Judge King reasoned

that, "in light of [the] observation that statutory grants of presidential waiver in other contexts

consistently specify the section or subsection that may be waived, they do confirm that

Congress'[s] grant of the power to waive 'the requirements of this section' is ambiguous."  Id. at

1329.  For the reasons stated in Part II.C.2, however, the Court disagrees with this reasoning and

declines Jacobsen's invitation to accept Judge King's interpretation of the Presidential waiver

provision of Section 117.

      In addition to Alejandre, Jacobsen relies on Judge Lamberth's opinion in

Eisenfeld v. Islamic Republic of Iran, 172 F. Supp. 2d 1, 10 (D.D.C 2000), although he concedes

that in Eisenfeld Judge Lamberth did not expressly state that punitive damages were awarded

pursuant to Section 117(b) of the October 1998 Amendment.  See Opp. Mot. S.J. 1 (1/7/03) at 3.

Instead, he directs the Court to Judge Lamberth's later decision in <u>Weinstein v. Islamic Republic of Iran</u>, 184 F. Supp. 2d 13 (D.D.C. 2002), in which Judge Lamberth suggested that the punitive damages that he had awarded in <u>Eisenfeld</u> were in fact based on the availability of Section 117(b) in 2000.  <u>Id</u>. at 24 n.1.  Judge Lamberth noted there:

> The plaintiffs also seek punitive damages against the Islamic Republic of Iran itself.  As the Court noted in <u>Elahi</u>, however, punitive damages may not be awarded against the Islamic Republic of Iran because 'Congress recently repealed legislation that would have permitted punitive damages against a foreign state in cases, such as this one, brought under 28 U.S.C. § 1605(a)(7).' In so doing, Congress returned the law to its pre-1998 state . . . The Court's decision in <u>Eisenfeld</u> predated this statutory change.  Thus, while the Court did award such damages in <u>Eisenfeld</u>, it cannot do so in the instant case.

<u>Id</u>. (internal citations omitted).

Like <u>Alejandre</u>, <u>Eisenfeld</u> had not been decided at the time the underlying action in this case was litigated before Judge Jackson, nor is it binding on this Court.  More importantly, neither <u>Eisenfeld</u> nor <u>Weinstein</u> addresses the scope of the Presidential waiver provision in Section 117(d).  In <u>Eisenfeld</u>, Judge Lamberth did not specify the basis for the punitive damages he awarded, <u>see</u> <u>Eisenfeld v. Islamic Republic of Iran</u>, 172 F. Supp. 2d at 9, and therefore apparently saw no need to examine the waiver provision in any detail.  Thus, there is no support for Jacobsen's position in the language or holding of <u>Eisenfeld</u>; citation to that decision alone does not further his argument.  As for <u>Weinstein</u>, Judge Lamberth's footnote in <u>Weinstein</u> is both dicta and inapposite.  <u>See</u> <u>Weinstein v. Islamic Republic of Iran</u>, 184 F. Supp. 2d at 24 n.1.  When Judge Lamberth decided <u>Weinstein</u> in 2002, the issue of the 1998 Presidential Waiver had been mooted by the 2000 repeal of Section 117(b) in the VTVPA, placing the issue beyond the scope of the case.  <u>See</u> Pub. L. No. 106-386, § 2002, 114 Stat. 1541.  The disposition of <u>Weinstein</u> was not dependant on footnote 1 or on <u>Eisenfeld</u>, and Judge

Lamberth had no need to examine the scope of the waiver in order to decide the matter before

him.  Weinstein therefore does no more than imply, without deciding or analyzing the question,

that punitive damages were available at the time of Eisenfeld.

      The more relevant decisions of this Court are Anderson v. Islamic Republic of

Iran, 90 F. Supp. 2d 107 (D.D.C. 2000), and Higgins v. Islamic Republic of Iran, 2000 WL

33674311, *7 (D.D.C. Sept. 21, 2000).  In Anderson, Judge Jackson noted that the Foreign

Sovereign Immunities Act "expressly exempts a foreign state from liability for punitive

damages."  Anderson v. Islamic Republic of Iran, 90 F. Supp. 2d at 114.  Similarly, in Higgins,

Judge Kollar-Kotelly held that the Foreign Sovereign Immunities Act prohibited the award of

punitive damages against Iran. See 2000 WL 33674311 at *7.  Anderson was decided in March

2000, and Higgins was decided in September 2000, when President Clinton's 1998 waiver was

still in force and before the VTVPA was enacted and waived, in October 2000.  See Pub. L. No.

106-386, § 2002, 114 Stat. 1541; see also Pres. Determination No. 2001-03, 65 Fed. Reg. 66483

(2000).  If Section 117(b) had been in effect prior to its repeal in the VTVPA, neither Judge

Jackson nor Judge Kollar-Kotelly could have reached the conclusion that Iran was exempt from

punitive damages.  Thus, both judges implicitly acknowledged that President Clinton's waiver

had in fact applied to Section 117(b). [3]

---

[3]    It should be pointed out that the Court actually was not required to explore the scope of
President Clinton's waiver in Anderson, Higgins, Eisenfeld or Weinstein, and consequently none
of these decisions directly assists this Court in its analysis today.  Judge Lamberth did, however,
squarely address the scope of the President's waiver as it related to paragraph (f)(2) of Section
117 in Flatow v. Islamic Republic of Iran, 76 F. Supp. 2d 16 (D.D.C. 1999).  Judge Lamberth
noted there that "because the plain language of Section 1601(f)(1) imposes certain requirements,
to wit, that certain regulated properties 'shall' be subject to execution or attachment," the waiver,
which refers to all "requirements" must apply to it.  See id. at 27 (citing Lexecon, Inc. v. Milberg
Weiss Bershad Hynes & Lerach, 523 U.S. 26, 35 (1998) (noting that "'shall' . . . normally
creates an obligation impervious to judicial discretion")).  He concluded that (f)(2) was a
requirement because it "required" that certain property *shall* be subject to execution or
attachment.  See Flatow v. Islamic Republic of Iran, 76 F. Supp. 2d at 26.

4.  Separation of Powers

Finally, Jacobson argues that reading Section 117(d) to extend waiver authority to

Subsection (b) gives rise to a constitutional separation of powers issue.  Under the constitutional

avoidance doctrine, Jacobsen urges the Court to avoid this construction if it is possible to decide

the matter on other grounds.  See Spector v. Norwegian Cruise Line Ltd., 125 S. Ct. 2169, 2183

(2005).  This argument is answered in full by the D.C. Circuit's decision in Acree v. Iraq, 370

F.3d 41 (D.C. Cir. 2004), which eliminates any doubt that the Court may approach this question

as one of statutory interpretation that does not create a constitutional question.  In Acree, the

plaintiff argued that a presidential waiver provision was unconstitutional if construed to deprive

the courts of jurisdiction over his claim against Iraq.  See id. at 48, 64 n.3.  The United States

intervened to argue that the presidential waiver at issue was constitutional and served to protect

the President's foreign policy power.  See id. at 43.  The majority in Acree decided on other

statutory construction grounds and did not reach the constitutional issue.  See id. at 48.  In his

concurring opinion, however, Judge (now Chief Justice) Roberts discussed the constitutional

issue, noting that the waiver in question did not resemble the line-item veto at issue in Clinton v.

New York, 524 U.S. 417 (1998), but was instead "akin to the waivers that the President is

routinely empowered to make in other areas, particularly in the realm of foreign affairs."  Acree

v. Iraq, 370 F.3d at 64 n.3 (citing 22 U.S.C. § 7207(a)(3) ("The President may waive the

---

Judge Lamberth's reasoning in Flatow suggests that the waiver authority in Subsection (d) should extend to Subsection (b) for the same reasons it extended to paragraph (f)(2). Subsection (b) amended 28 U.S.C. § 1606, which reads in relevant part [with the language from Subsection (b) in brackets]: ". . . but a foreign state except for an agency or instrumentality thereof shall not be liable for punitive damages [except any action under section 1605(a)(7) or 1610(f)]."  28 U.S.C. § 1606; see also Pub. L. No. 105-277, § 117(b), 112 Stat. 2681-491.  Much like the language in (f)(2) analyzed by Judge Lamberth, the language in 117(b) "requires" that certain damages *shall* be available (or, more exactly, *shall not not* be available).  Jacobsen objects to this analogy in spite of the fact that Flatow represents perhaps this Circuit's fullest analysis of the 1998 Presidential Waiver.  See Opp. Mot. Part. S.J. I (1/7/03) at n.4.

application of paragraph (1) with respect to Iran, Libya, North Korea, and Sudan to the degree

the President determines that it is in the national security interest of the United States to do so, or

for humanitarian reasons.")).  In view of <u>Acree</u>, the Court finds no constitutional bar to disposing

of this motion on statutory interpretation grounds.

       For the foregoing reasons, the Court holds that Section 117(b) was within the

scope of President Clinton's waiver pursuant to Section 117(d) of the October 1998 Amendment.

Based on this conclusion, the Court finds that punitive damages against Iran were not available

to Jacobsen at any time and that Jacobsen's request for punitive damages therefore would have

been denied under 28 U.S.C. § 1606 and the 1998 Presidential Waiver.  Because Jacobsen has

failed to prove that he would have succeeded in the underlying action of his legal malpractice

claim, defendants' motion for summary judgment on Jacobsen's Rule 60(b)(6) claim must be

granted.

*D.  Motion for Summary Judgment on*
*Jacobsen's Legal Malpractice Claim Relating to MOIS*

       On May 13, 2003, defendants filed their second motion for partial summary

judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.  <u>See</u> F<small>ED</small>. R. C<small>IV</small>. P. 56.

This motion addresses Jacobsen's second theory of negligence, that Oliver should have advised

him to add Iran's Ministry of Intelligence ("MOIS") as a defendant in <u>Cicippio II</u>.  <u>See</u>

Defendants' Motion for Partial Summary Judgment on Plaintiff's Negligence Claim Relating to

Iran's Ministry of Intelligence (5/13/03) ("Part. Mot. S.J. II (5/13/03)") at 2; <u>see</u> <u>also</u> <u>Cicippio v.</u>

<u>Islamic Republic of Iran</u>, 18 F. Supp. 2d 62 (D.D.C. 1998).

1. Background

The initial complaint in Cicippio II did not request punitive damages.  See Part.

Mot. S.J. II (5/13/03) at 3.  The issue of punitive damages first arose in Cicippio II after Judge

Lamberth issued his decision in Flatow v. Islamic Republic of Iran, 999 F. Supp. 1, 26 (D.D.C.

1998), in which he construed the Flatow Amendment to provide a cause of action and punitive

damages against a sovereign state "indirectly" under a theory of respondeat superior or vicarious

liability.  On July 14, 1998, Judge Jackson informed Jacobsen that he disagreed with this

interpretation of the Flatow Amendment, presumably because the FSIA prohibited punitive

awards against a sovereign state under 28 U.S.C. § 1606.  See Jacobsen v. Oliver, 201 F. Supp.

2d 93, 97 (D.D.C. 2002); Part. Mot. S.J. II (5/13/03) at 3; see also Cicippio-Puleo v. Islamic

Republic of Iran, 353 F.3d 1024, 1033 (D.C. Cir. 2004) (rejecting Judge Lamberth's

interpretation of the Flatow Amendment and noting that "neither 28 U.S.C. § 1605(a)(7) nor the

Flatow Amendment, nor the two considered in tandem, creates a private right of action against a

foreign government").  Judge Jackson stated, however, that he would allow Jacobsen to amend

his complaint to request punitive damages against agencies or instrumentalities of Iran, because

Section 1606 permits punitive damage awards against agencies or instrumentalities.  See 28

U.S.C. § 1606; Jacobsen v. Oliver, 201 F. Supp. 2d at 97.  Jacobsen argues that Oliver's failure

to add MOIS at this time deprived him of the punitive damages he would have been awarded

under the Flatow Amendment in conjunction with Section 1606.  See Memorandum of Points

and Authorities in Opposition to Defendants' Second Motion for Partial Summary Judgment

(6/13/03) ("Opp. Mot. Part. S.J. II (6/13/03)") at 4.

Jacobsen argues that MOIS's status is one of fact, not of law.  Thus, even if the

question of MOIS's status as an "agency" or "instrumentality" of Iran was solely for the trial

judge to make in the underlying action, the question must be submitted to a jury as part of the

negligence inquiry in this legal malpractice suit.  See Plaintiff's Supplemental Memorandum in

Opposition to Defendants' Motion for Partial Summary Judgment ("Supp. Mem. Opp. Part. Mot.

S.J. II (12/08/04)") at 10-14.  Jacobsen also contends that the status of MOIS depends on

disputed facts that cannot be resolved in a motion for summary judgment.  See Plaintiff's

Supplemental Memorandum in Opposition to Defendants' Motion for Partial Summary

Judgment on Plaintiff's Negligence Claim Relating to Iran's Ministry of Intelligence (7/23/03)

("Supp. Opp. Mot. Part. S.J. II (7/23/03)") at 7. Neither argument is correct as a matter of law.

2. Determining "Agency or Instrumentality" Status as a Matter of Law

Contrary to Jacobsen's argument, the "agency or instrumentality" determination

under the FSIA is always one to be made by the Court as a matter of law.  See Transaero, Inc. v.

La Fuerza Aerea Boliviana, 30 F.3d 148, 152-53 (D.C. Cir. 1994) (establishing the categorical

approach to the agency or instrumentality determination and deciding that the Bolivian armed

forces are "the state itself" as a matter of law); see also Roeder v. Islamic Republic of Iran, 333

F.3d 228, 234 (D.C. Cir. 2003) (applying Transaero test and concluding as a matter of law that

Iran's Ministry of Foreign Affairs is an agency or instrumentality); Phoenix Consulting Inc. v.

Republic of Angola, 216 F.3d 36, 39 (D.C. Cir. 2000) ("the district court must make the 'critical

preliminary determination' of its own jurisdiction [under the FSIA] as early in the litigation as

possible").  "What is required is that 'the [Court] determine what the [original court] would have

done" using the same standards that the [original court] would have applied." Ocean Ships, Inc.

v. Stiles, 315 F.3d 111, 118 (2d Cir. 2002) (malpractice suit premised on attorney's failure to

perfect appeal of denial of personal jurisdiction; therefore District Court must rule as a matter of

law on underlying action as the appeal court would have); Scaramuzza v. Sciolla, 2006 U.S.

Dist. LEXIS 8264 (E.D. Pa. 2006) ("[W]here the relevant underlying proceeding was decided by a court sitting without a jury, then the 'case within a case' of the legal malpractice action should also be decided by a court rather than a jury."); see also 4 LEGAL MALPRACTICE § 33.12 ("The trial judge should decide what issues are of law to be decided only by the court and what are of fact to be decided only by the trier of fact . . . Issues of law do not become issues of fact for the jury in a legal malpractice action.").  Thus, the determination whether MOIS should be treated as a sovereign was for Judge Jackson to make as a matter of law in Cicippio II and the question remains one properly before the Court today.

The FSIA grants blanket immunity to foreign states under Section 1604 and then waives it pursuant to the exceptions enumerated therein.  See 28 U.S.C. § 1602-1611; see also Acree v. Republic of Iraq, 370 F.3d 41, 44 (D.C. Cir. 2004).  Section 1603(a), which defines a "foreign state" for purposes of the FSIA, includes political subdivisions and agencies or instrumentalities thereof.  See 28 U.S.C. § 1603(a).  Section 1603(b) then defines "agency or instrumentality" as "any entity – (1) which is a separate legal person, corporate or otherwise, and (2) which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof . . . ."  See 28 U.S.C. § 1603(a).  Beyond this definition, the FSIA does not further elucidate the distinction between a "foreign state" and an "agency or instrumentality thereof." See Transaero, Inc. v. La Fuerza Aerea Boliviana, 30 F.3d at 151.

Because Section 1603(a) defines "foreign state" as including "agencies and instrumentalities," the distinction between the two is only relevant in the FSIA where explicitly drawn.  Section 1608, for example, makes such a distinction for purposes of service of process. See 28 U.S.C. § 1608; see also Transaero, Inc. v. La Fuerza Aerea Boliviana, 30 F.3d at 151-52

(establishing categorical approach to "agency or instrumentality" determination in context of Section 1608 service of process provision).  Section 1606, the punitive damages provision of the FSIA at issue here, also makes the distinction: "[A] foreign state except for an agency or instrumentality thereof shall not be liable for punitive damages . . . ." 28 U.S.C. § 1606.  Thus, if MOIS is not an agency or instrumentality of Iran, but is rather "the foreign state itself," punitive damages would not have been available to Jacobson at the time of <u>Cicippio II</u>, and Oliver's failure to pursue them was not negligent as a matter of law.  As discussed below, the Court concludes that MOIS is not an agency or instrumentality, and Section 1606 of the FSIA therefore prevented the award of punitive damages against MOIS at the time of <u>Cicippio II</u>.  The Court grants defendants' second motion for partial summary judgment on plaintiff's legal malpractice claim relating to Iran's Ministry of Intelligence.

   3.  The D.C. Circuit's Approach to Determining "Agency or Instrumentality" Status

         At the time of <u>Cicippio II</u>, this Circuit had already adopted a "categorical approach" to refining the definitions given in Section 1603 of the FSIA.  If the core functions of the entity are governmental, it is considered the foreign state itself; if commercial, the entity is an agency or instrumentality of the foreign state.  <u>See Transaero, Inc. v. La Fuerza Aerea Boliviana</u>, 30 F.3d at 153.  In <u>Transaero</u>, the D.C. Circuit was forced to make the distinction between a state and its agency or instrumentality in the context of Section 1608's requirements for service.  <u>Id</u>. at 151.  The court reasoned that the categorical approach offered the best fit with the "restrictive theory" of sovereign immunity that the FSIA largely codified.  <u>See id</u>. at 151-52; <u>see also Verlinden B.V. v. Central Bank of Nigeria</u>, 461 U.S. 480, 488 (1983).  Using this distinction, the court held that armed forces "are as a rule so closely bound up with the structure of the state that they must in all cases be considered as the 'foreign state' itself, rather than a

separate 'agency or instrumentality' of the state."   Transaero, Inc. v. La Fuerza Aerea Boliviana, 30 F.3d at 153.

Ten months prior to the entry of the default judgment in Cicippio II, the D.C. Circuit clarified the scope of the Transaero rule in Crist v. Republic of Turkey, 1997 U.S. App. LEXIS 749, *3 (1997) (unreported decision).   If there was any doubt about the application of the Transaero test to provisions of the FSIA other than Section 1608's service provision, Crist surely dispelled them.   See id. at *5-*7 (applying Transaero test to Turkish Army in context of FSIA Section 1605 and holding that Army is part of state).   Crist explicitly stated that "the language of the Transaero opinion . . . does not support limiting the opinion to the service of process context."   Id. at *5.   Rather, citing to 28 U.S.C. § 1603, Crist made clear that "the Transaero court interpreted the FSIA's general definition of 'agency or instrumentality' . . . ."   Id. (emphasis added).   Section 1603, in turn, establishes that the definitions contained therein are "[f]or purposes of this chapter," 28 U.S.C. § 1603, including Section 1606, at issue here.   The Court therefore concludes that, in determining what "should have been" the result in the underlying action, the Transaero test must apply.

In 2003, the D.C. Circuit again applied the Transaero test and held that the Iranian Ministry of Foreign Affairs was "the state of Iran itself rather than . . . its agent."   Roeder v. Islamic Republic of Iran, 333 F.3d 228, 235 (D.C. Cir. 2003).   The court concluded that "[t]he conduct of foreign affairs is an important and 'indispensable' governmental function" that places the Ministry on the side of "the state itself" and therefore beyond the reach of punitive damages. See id. at 234-35.[4]

---

[4]      As previously discussed, subsequent decisions are not binding on this Court's assessment of the state of the law – and therefore the determination of the "trial within a trial" on MOIS's status – at the time of Cicippio II.   Nevertheless, later decisions do help to illuminate the state of the law at the time, particularly when, as here, the subsequent jurisprudence further clarifies a long-standing rule rather than overturns, alters, or undermines it.   Subsequent case law helps

Applying the reasoning of <u>Transaero</u>, <u>Crist</u> and <u>Roeder</u>, two judges of this Court – Chief Judge Hogan and Judge Bates have recently held that Iran's Ministry of Information and Security, like its Ministry of Foreign Affairs "should be treated as the foreign state itself."  <u>See</u> <u>Regier v. Islamic Republic of Iran</u>, 281 F. Supp. 2d 87, 103 (D.D.C. 2003); <u>Tracy v. Islamic Republic of Iran</u>, Civ. No. 01-2517, 2003 U.S. Dist. LEXIS 15844, at *24-26 (D.D.C. Aug. 21, 2003).  These recent decisions of this Court further clarify the application of the <u>Transaero</u> standard to MOIS.  After considering the <u>Transaero</u> test, Judge Bates concluded in <u>Regier</u> that "it is difficult to imagine how intelligence and security activities . . . could be considered predominately 'commercial' rather than 'governmental.'"  <u>Regier v. Islamic Republic of Iran</u>, 281 F. Supp. 2d at 102.  Accordingly, "[a]n application of the categorical approach to the term 'agency or instrumentality'. . . leads inexorably to the conclusion that MOIS should be treated as the foreign state itself and hence cannot be liable for punitive damages under the language of §§ 1603(b) and 1606."  <u>Id</u>. at 103.  Chief Judge Hogan reached the same conclusion in <u>Tracy</u>.  <u>See</u> 2003 U.S. Dist. LEXIS 15844 at *25.  Under the <u>Transaero</u> test as it would have been applied, this Court also concludes that punitive damages were prohibited against MOIS by 28 U.S.C. § 1606.

4.  Jacobsen's Own Experts Agree that MOIS is "the State Itself"

Jacobsen nevertheless argues that MOIS's status hinges on disputed material facts, and he suggests that "Ministries of Information and Security, if there are any outside of Iran, cry out for definition."  Supp. Opp. Mot. Part. S.J. II (7/23/03) at 7.  He asks: "What does a Ministry of Information and Security do?;" "How many nations even have a Ministry of Information and Security?;" and "For those that do, do all of them perform the same functions?"

---

explain what "should have happened," <u>see</u> 4 Legal Malpractice § 33.9, and it provides guidance as to how the trial-within-a-trial would have come out.

Id.  But these questions are answered by Jacobsen's own experts.  Dr. Patrick Clawson stated that MOIS is "probably the largest spy service in the Middle East," which is "in charge of collecting information, identifying targets, and finding out what [Iran's enemies] are doing." Transcript of Testimony of Dr. Patrick Clawson in Anderson v. Islamic Republic of Iran, No. 99-698 at 97-99 (Feb. 16, 2000), cited in Opp. Mot. Part. S.J. II (6/13/03) at 9.  Dr. Clawson also noted that MOIS was formed in the wake of the Iranian revolution as "the successor to the Shah's Organization for Information and Security (known by its initials in Persian, SAVAK) [and] was entrusted with some of the most politically delicate tasks for the new government." Expert Report of Patrick L. Clawson at 3-4.  Of particular relevance to this case, he stated:

> MOIS has been a major institution through which the Iranian government has provided financial, technical, and material support for terrorism, including the holding of hostages in Lebanon, such as David Jacobsen.  Neither Hezbollah nor any institution or agency of the Iranian government other than MOIS had the expertise and skills needed to hold Jacobsen captive while eluding the extensive search efforts made by the U.S. and Israeli governments among others.

Id. at 3.

Another expert analogized MOIS to the KGB, see Defendants' Revised Brief in Support of Motion for Partial Summary Judgment on Plaintiff's Negligence Claim Relating to Iran's Ministry of Intelligence (5/13/03) at 9, further establishing that MOIS serves as Iran's intelligence service.  Yet another expert retained by Jacobsen certified that MOIS was established by the government of Iran

> to secure and process security information and foreign intelligence, to protect intelligence, to conduct counter intelligence, and to secure the necessary intelligence on domestic and foreign enemies in order to prevent and counter their plots against the Islamic Revolution, against the state, and against the regime of the Islamic Republic of Iran.

Hosseinbor Expert Report at Ex. B.  These descriptions make plain that MOIS is engaged in the type of "intelligence and security activities" that led the courts in <u>Regier</u> and <u>Tracy</u> to find its activities governmental rather than commercial in nature.  <u>See</u> <u>Regier v. Islamic Republic of Iran</u>, 281 F. Supp. 2d at 102.  The Court finds the analysis of <u>Regier</u> and <u>Tracy</u> to be compelling.

### 5.  Jacobsen's Reliance on <u>Flatow</u>

Jacobsen relies on a series of decisions of judges of this Court, including the undersigned, all handed down after <u>Cicippio II</u>, that awarded punitive damages against MOIS as an agency or instrumentality for purposes of Section 1606.  <u>See</u> Opp. Mot. Part. S.J. II (6/13/03), Ex. D; Supp. Opp. Mot. Part. S.J. II (7/23/03) at 1.  The Court acknowledges this line of cases. The law of this Circuit, however, was clear after <u>Transaero</u>, but a number of judges of this Court, the undersigned included, either ignored it or misapplied it.  <u>See</u> <u>Kilburn v. Republic of Iran</u>, 277 F. Supp. 2d 24, 44 (D.D.C. 2003) (Urbina, J.) (declining to "strictly apply" the <u>Transaero</u> test to the Libyan External Security Organization); <u>Peterson v. Islamic Republic of Iran</u>, 264 F. Supp. 2d 46, 62 (D.D.C. 2003)  (Lamberth, J.) (consolidated proceedings of <u>Peterson v. Islamic Republic of Iran</u> and <u>Boulos v. Islamic Republic of Iran</u>); <u>Stethem v. Islamic Republic of Iran</u>, 201 F. Supp. 2d 78, 92 (D.D.C. 2002) (Jackson, J.); <u>Surette v. Islamic Republic of Iran</u>, 231 F. Supp. 2d 260, 273-74 (D.D.C. 2002) (Friedman, J.); <u>Weinstein v. Islamic Republic of Iran</u>, 184 F. Supp. 2d 13, 24 (D.D.C. 2002) (Lamberth, J.); <u>Mousa v. Islamic Republic of Iran</u>, 238 F. Supp. 2d 1, 4 (D.D.C. 2001) (Bryant, J.); <u>Wagner v. Islamic Republic of Iran</u>, 172 F. Supp. 2d 128, 137 (D.D.C. 2001) (Jackson, J.); <u>Sutherland v. Islamic Republic of Iran</u>, 151 F. Supp. 2d 27, 47, 52 (D.D.C. 2002) (Lamberth, J.); <u>Jenco v. Islamic Republic of Iran</u>, 154 F. Supp. 2d 27, 33 (D.D.C. 2001) (Lamberth, J.); <u>Anderson v. Islamic Republic of Iran</u>, 90 F. Sup. 2d 107, 114 (D.D.C. 2000) (Jackson, J.); <u>Elahi v. Islamic Republic of Iran</u>, 124 F. Supp. 2d 97, 113 (D.D.C.

2000) (Green, J.); Eisenfeld v. Islamic Republic of Iran, 172 F. Supp. 2d 1, 6 (D.C.C. 2000)

(Lamberth, J.); Flatow v. Islamic Republic of Iran, 999 F. Supp. 1, 26 (D.D.C. 1998) (Lamberth,

J.).  The mere existence of these cases is insufficient to award the "trial within a trial" on this

issue to Jacobsen because the proper "standard is objective – what a 'reasonable' judge should

have awarded, not what a particular judge would have decided."  4 LEGAL MALPRACTICE

§ 33.25.  Under that standard, and for the reasons just discussed, this Court concludes that the

decisions in Regier and Tracy represent what "should have happened" in the underlying action

before Judge Jackson in light of the Transaero test and its application in Crist.  See Regier v.

Islamic Republic of Iran, 281 F. Supp. 2d 87 (D.D.C. 2003); Tracy v. Islamic Republic of Iran,

Civ. No. 01-2517, 2003 U.S. Dist. LEXIS 15844 (D.D.C. Aug. 21, 2003).

            The decisions relied on by Jacobsen all stem from an initial error of law made in

Flatow v. Islamic Republic of Iran, 999 F. Supp. at 26.  In Flatow, Judge Lamberth concluded

that "[a] foreign state's intelligence service most closely meets 28 U.S.C. § 1603(b)'s definition

of an 'agency or instrumentality' as: a separate legal person which is neither a citizen of a State

of the United States nor created under the laws of a third country; an organ of a foreign state;

operated by public employees paid by the foreign state; and occupying a unique role defined and

granted by the government."  Id. at 26.  In reaching this conclusion, Judge Lamberth relied on

one unpublished decision from the United States Court of Appeals for the Ninth Circuit,

Corporacion Mexicana de Servicios Maritimos, S.A. de C.V. v. M/T Respect, 1996 U.S. App.

LEXIS 22068, (amending 89 F.3d 650 (9th Cir. 1996)), and a case from the United States

District Court for the Central District of California, Intercontinental Dictionary Series v. De

Gruyter, 822 F. Supp. 662, 673 (C.D. Cal. 1993).  Following his citation to these two non-D.C.

Circuit decisions, Judge Lamberth acknowledged Transaero with a "But see" citation, but

declined to follow it.  See Flatow v. Islamic Republic of Iran, 999 F. Supp. at 26.  Because the

Islamic Republic of Iran did not contest the claims against them in either Flatow or in any of the

above cases, no counter-argument was ever presented to the trial judge and no appeal was taken

that would have corrected this error of law.  The line of cases that relied on Flatow thus

continued to grow.  Nevertheless, even if Judge Jackson in Jacobsen's underlying case might

have determined that MOIS was an "agency or instrumentality" of Iran based on this line of

cases, that determination is not the one he should have made based on the state of the law under

Transaero.  Jacobsen's theory of causation cannot rely on the likelihood that Judge Jackson

would have made a mistake of law by failing to apply the Transaero standard.

       Perhaps recognizing the futility of the argument that the many incorrect decisions

of judges of this Court should trump Transaero, Jacobsen next argues that even under the

Transaero standard MOIS cannot be granted sovereign immunity as a governmental entity

because of its support of terrorism.  See Plaintiff's Memorandum in Opposition to Defendants'

Supplemental Brief in Support of Motion for Partial Summary Judgment as to Iran's Ministry of

Information and Security (11/12/03) at 6.  According to Jacobsen, Roeder's application of

Transaero fails to address the "sea change" in the applicable law introduced by Section

1605(a)(7), which demonstrated congressional condemnation of terrorism and terrorist activities.

Id.  Under this theory, terrorism "can no longer be classified as a legitimate government activity,

within the contemplation of the governmental/commercial dichotomy of Transaero."  Id.  Thus,

the determination of the sovereign status of MOIS should assess whether the gravamen of the

claim asserted arises from legitimately governmental activity or from the support of terrorism.

See id.  This gloss on the statute cannot be accepted.  The fact that the acts of violence and

terrorism listed in Section 1605(a)(7) are monstrous, reprehensible and illegitimate was clear to

the D.C. Circuit when it applied the Transaero test – first in Crist, then in Roeder – even after the so-called "sea change" – with no suggestion that its application was undermined by the passage of Section 1605(a)(7).  Even if the Court agreed with Jacobsen that the enactment of Section 1605(a)(7) represented some sort of "sea change," it could not simply ignore the clear language of Section 1606 and binding D.C. Circuit precedent.

      In Transaero's place Jacobsen would have the Court adopt the approach of the Ninth Circuit in Ministry of Defense and Support for the Armed Forces of Iran v. Cubic Defense Systems, Inc., 385 F.3d 1206 (9th Cir. 2004), on the issue of whether MOIS is an "agency or instrumentality" of Iran.  See Supp. Mem. Opp. Part. Mot. S.J. II (12/08/04) at 5-7.  But as Judge Bates noted in Regier, "it is not the place of this Court . . . to avoid D.C. precedent."  Regier v. Islamic Republic of Iran, 281 F. Supp. 2d at 104.  Transaero is clear: this Circuit adopts a categorical approach to the FSIA inquiry.  See Transaero, Inc. v. La Fuerza Aerea Boliviana, 30 F.3d at 153; Crist v. Republic of Turkey, 1997 U.S. App. LEXIS 749, *3 (1997) (unreported decision).  "Congress'[s] language in §§ 1603(b) and 1606 and the D.C. Circuit's interpretation in Roeder and Transaero constrain this Court.  Concerns about the implications of applying the categorical approach in the context of § 1606 are more appropriately addressed to Congress or the D.C. Circuit."  Regier v. Islamic Republic of Iran, 281 F. Supp. 2d at 104.  Because punitive damages were not available against MOIS at the time of the underlying action, no objectively reasonable judge would have permitted Jacobsen's claim for punitive damages.  For this reason, the Court grants defendants' second motion for partial summary judgment on plaintiff's legal malpractice claim relating to Iran's Ministry of Information and Security.

### E.  Unreasonable and Excessive Fees

Having disposed of both theories of legal malpractice on summary judgment, Jacobsen's only remaining claim asserts that the 35 per cent contingency fee collected by the defendants was so excessive as to amount to a breach of fiduciary duty.  See Mot. S.J. (9/25/03) at 2; Opp. Mot. S.J. (11/28/03) at 41.  Although Jacobsen acknowledges that he had agreed in writing to pay 35 per cent of his recovery to his lawyers, see Jacobsen Deposition at 120-23, he alleges that his agreement to those terms was not the result of an informed choice and that a change in circumstances subsequent to the signing of the retainer agreement made the fee unreasonable.  See Opp. Mot. S.J. (11/28/03) at 44-45.  On the issue of informed choice, Jacobsen contends that the fee agreement was not a proper and standard agreement as he had been led to believe, thereby undermining his ability to make an informed choice.  See id. at 44. On the issue of changed circumstances, Jacobsen argues that Iran's decision not to contest the lawsuit, as well as the passage of legislation by Congress enabling collection of the judgment more than two years after it was issued, made the case easier than originally anticipated and, thus, affected the reasonableness of the initial fee agreement.  See id. at 45.

Section 35 of the Restatement of the Law Governing Lawyers addresses the reasonableness of contingent fees.  The Restatement suggests that "[a] tribunal will find a contingent fee unreasonable due to a defect in the calculation of risk in two kinds of cases in particular: those in which there was a likelihood of substantial recovery by trial or settlement, so that the lawyer bore little risk of nonpayment; and those in which the client's recovery was likely to be so large that the lawyer's fee would clearly exceed the sum appropriate to pay for services performed and risks assumed."  RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 35

cmt. c (2000).  The Restatement also offers an illustration describing a contingent fee of 35

percent.  See id. cmt. c, illus. 2.

   The District of Columbia Rules of Professional Conduct and the ABA Model

Rules of Professional Conduct similarly address the "reasonableness" inquiry in terms of risk.

Both sets of Rules include among the factors to be considered, "[t]he time and labor required, the

novelty and difficulty of the questions involved, and the skill requisite to perform the legal

services properly."  DISTRICT OF COLUMBIA RULES OF PROF'L CONDUCT R. 1.5(a)(1) (2006);

ABA MODEL RULES OF PROF'L CONDUCT R. 1.5(a)(1) (2003).  Both sets of Rules also explicitly

permit contingent fees, requiring only that such agreements "shall be in writing and shall state

the method by which the fee is to be determined . . . and whether such expenses are to be

deducted before or after the contingent fee is calculated."  DISTRICT OF COLUMBIA RULES OF

PROF'L CONDUCT R. 1.5(c) (2006); ABA MODEL RULES OF PROF'L CONDUCT R. 1.5(c) (2003).

Like the Restatement, the ABA Model Rules include examples of permissible contingent fee

agreements similar to or in excess of 35%.  See ABA MODEL RULES OF PROF'L CONDUCT R.

1.5(c) (2003) (citing cases upholding contingency fees of 33%, 40%, and 50%).

   Like the Restatement, the ABA Model Rules, and the District of Columbia Rules

of Professional Conduct, both parties concede that the question is essentially one of risk.  See

Mot. S.J. (9/25/03) at 43; Opp. Mot. S.J. (11/28/03) at 45.  Jacobsen contends that Iran's failure

to appear in Cicippio II lessened the risk of an adverse judgment.  See Opp. Mot. S.J. (11/28/03)

at 45.  At the time, however, Jacobsen appears to have understood that Oliver still faced

numerous challenges.  See S.J. Mot. (9/25/03), Ex. 11 (Fax from Jacobsen to Oliver dated

5/18/98) ("You took the case when no one else would . . ."), Ex. 12 (Letter from Jacobsen to

Oliver dated 6/9/98) (noting that Jacobsen's "high level political friends in Washington DC . . . recognize[d] that [Oliver was] pioneering in a new legal arena.").

A second, even greater risk was also present: the risk of non-payment.  In fact, until the passage of the VTVPA in 2000 -- four years after Jacobsen and Oliver entered into the contingent fee agreement at issue -- there was little hope of collecting any judgment against Iran. See Pub. L. No. 106–386, 114 Stat. 1541 (2000).  Jacobsen's correspondence during this period seems to demonstrate his awareness of this fact.  See, e.g., Mot. S.J. (9/25/03), Ex. 9 (Fax from Jacobsen to Oliver dated 8/19/97) (discussing State Department resistance to suits against foreign sovereigns and reciting "the old saying 'the Department of State represents foreign governments and not American citizens'"), Ex. 15 (Fax from Jacobsen to Michael Harrison, Legislative Aid to Congressman Duncan Hunter, undated) (seeking passage of a private bill to collect on the Cicippio II judgment at a 34.2 per cent discount), Ex. 16 (Letter from Jacobsen to David Andrews, Esq., Legal Advisor, U.S. Department of State) (requesting assistance in collecting Cicippio II judgment in the face of government resistance).  Thus, from the time the retainer agreement was signed until the passage of the VTVPA, as even Jacobsen seems to concede, the risk of non-payment was consistently and invariably high.  While Jacobsen suggests that the risk of non-payment was lowered because the judgment was actually collected, this perspective does not properly account for the risk that clearly existed from the time the contract was made through the point at which the VTVPA was passed.

The Court denies defendants' third motion for summary judgment as moot, except with respect to the issue of excessive fees, which is denied without prejudice.  The parties are directed to engage in settlement discussion regarding the issue of excessive fees.  If the parties are unable to reach a settlement agreement by December 1, 2006, the Court will refer the parties

to a magistrate judge for settlement discussions.  If the parties fail to reach a settlement after a

reasonable period with the assistance of a magistrate judge, either or both of the parties may

move for summary judgment on the issue of fees.

An Order consistent with this Opinion was issued on March 30, 2006.

SO ORDERED.

/s/_____
PAUL L. FRIEDMAN
United States District Judge

DATE: September 8, 2006