UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
_____
                                )
DAVID P. JACOBSEN,              )
                                )
            Plaintiff,          )
                                )
      v.                        )          Civil Action No. 01-1810 (PLF)
                                )
JAMES J. OLIVER, et al.,        )
                                )
            Defendants.         )
_____)
```

OPINION

    This attorneys' fees dispute arises out of the successful representation of plaintiff

David Jacobsen by his former attorneys, James J. Oliver, Carla E. Connor and Barbara A.

Barnes, and their law firm, Murphy, Oliver, Caiola & Gowen P.C. (collectively, "defendants") in

two actions against the Islamic Republic of Iran.  The matter came before the Court on two

motions for summary judgment: one on behalf of Mr. Oliver, Ms. Connor and Ms. Barnes (the

"individual defendants"), and one on behalf of Murphy, Oliver, Caiola & Gowen P.C. (the "law

firm").[1]  The Court heard oral argument on the motions on November 7, 2007.  Upon

consideration of the papers that have been filed with respect to these motions, the arguments

_____
    [1]      The papers submitted in connection with this matter include: Defendant Murphy
Oliver's Motion for Summary Judgment on the Attorneys' Fees Issue ("Firm Mot."); Plaintiff's
Memorandum in Opposition to Firm Defendant's Motion for Summary Judgment on the
Attorneys' Fees Issue ("Firm Mot. Opp."); Individual Defendants' Motion for Summary
Judgment on the Attorneys' Fees Issue ("Individual Mot."); Plaintiff's Memorandum in
Opposition to Individual Defendants' Motion for Summary Judgment on the Attorneys' Fees
Issue ("Individual Mot. Opp."); Individual Defendants' Reply Brief  ("Defs.' Reply");
Defendants' Supplemental Brief in Response to the Court's Order of February 22, 2008 ("Defs.'
Supp."); Plaintiff's Supplemental Brief in Response to Court's Order of February 22, 2008
("Pl.'s Supp."); and Defendants' Response to Plaintiff's Supplemental Brief.

presented orally by counsel, and the entire record in this case, the Court granted summary

judgment in favor of defendants in an Order and Judgment issued on March 28, 2008.  This

Opinion explains the reasoning behind that Order.

## I. BACKGROUND

The nature and origin of this dispute have been described at length on at least two

occasions.  See Jacobsen v. Oliver, 451 F. Supp. 2d 181, 183-86 (D.D.C. 2006) (Friedman, J.);

Jacobsen v. Oliver, 201 F. Supp. 2d 93, 96-98 (D.D.C. 2002) (Huvelle, J.).  A short summary

will suffice for present purposes.

In 1992, Mr. Jacobsen hired defendants to seek legal relief against Iran, which Mr.

Jacobsen alleged had provided material support and resources to the terrorists who kidnapped

him in Beirut, Lebanon in May 1985 and held him captive for 532 days.  At the outset of their

relationship, the parties agreed to a contingent fee arrangement under which Mr. Jacobsen would

pay 35% of any recovery to the defendants.  See Firm Mot., Defendants' Statement of Material

Facts ¶ 4 ("Defs.' Facts").  See also Firm Mot., Ex. H, Contingent Fee Agreement at 1 (1996)

(the "Contract").[2]  As Judge Huvelle explained, the parties then embarked on a long and

complicated legal odyssey:

> At the time [of plaintiff's initial suit], the availability of legal
> remedies was problematical, because the Foreign Sovereign
> Immunities Act granted immunity from lawsuits to foreign states
> with only limited exceptions.  Nonetheless, defendants brought suit

---

[2]      On July 18, 1996, plaintiff and defendants executed a new agreement because the
original 1992 agreement could not be located; it is the 1996 agreement that the Court refers to as
the "Contract" throughout this Opinion.  See Defs.' Facts ¶ 8; Firm Mot., Ex. B, Deposition of
David Jacobsen at 171-72 (Dec. 16, 2002) ("Jacobsen Dep.").  Both agreements provided for a
fee of 35% of plaintiff's recovery.  See Defs.' Facts ¶ 9; Jacobsen Dep. at 171-73.

> in this Court in October 1992 on behalf of [Mr. Jacobsen and
> others] against the Islamic Republic of Iran under the FSIA.
> <u>Cicippio v. Islamic Republic of Iran</u>, No. 92-cv-2300 (D.D.C.
> 1992) (hereinafter "<u>Cicippio I</u>").  In 1993, Judge Jackson dismissed
> the suit without prejudice, concluding that defendants had not
> presented a viable legal claim under the FSIA.  <u>Cicippio v. Islamic
> Republic of Iran</u>, 1993 WL 730748 (D.D.C. 1993), *aff'd*, 30 F.3d
> 164 (D.C. Cir. 1994), *cert. denied*, 513 U.S. 1078 (1995).
>
> Subsequent to this dismissal, Jacobsen and defendants actively
> lobbied Congress and the Clinton administration to pass legislation
> that would allow for lawsuits against foreign states that sponsored
> terrorism.  Ultimately, these efforts were successful.  In April
> 1996, Congress passed the Anti-Terrorism and Effective Death
> Penalty Act of 1996 . . . which amended the FSIA to allow for
> lawsuits against foreign states that sponsor terrorism. . . . [I]n July
> 1996, defendants refiled their suit against Iran on behalf of
> [plaintiff and others] (hereinafter "<u>Cicippio II</u>").

<u>Jacobsen v. Oliver</u>, 201 F. Supp. 2d at 96-97.

After Iran failed to appear in <u>Cicippio II</u>, and following an evidentiary hearing,

Judge Jackson entered a default judgment in favor of Mr. Jacobsen, awarding him nine million

dollars in compensatory damages.  <u>See</u> <u>Cicippio II</u>, 18 F. Supp. 2d 62, 70 (D.D.C. 1998).  Mr.

Jacobsen recovered this judgment in full after Congress passed legislation in 2000 that permitted

hostage victims who had secured judgments prior to July 20, 2000 to recover all of their

compensatory damages.  <u>See</u> Victims of Trafficking and Violence Protection Act of 2000, Pub.

L. 106-386, 114 Stat. 1464 ("VTVPA"); Defs.' Facts ¶¶ 16-17.[3]

Mr. Jacobsen was dissatisfied with the size of his recovery and the quality of

---

[3]     Even though he had sent defendants a letter terminating their services in April
2000, Mr. Jacobsen asked defendants to make an application to the fund created by the VTVPA
on his behalf in November 2000, which defendants did.  <u>See</u> Defs.' Facts ¶ 16.  The United
States government ultimately remitted the sum of $10,143,761.78 to defendants under the
VTVPA, and defendants remitted 65% of that sum to plaintiff.  <u>See</u> <u>id</u>. ¶ 17.

defendants' services.  He was so dissatisfied in fact that he sued defendants, claiming that they committed legal malpractice and breached their fiduciary duty of loyalty.  Mr. Jacobsen faulted defendants "for failing to seek an award of punitive damages under either of two separate theories that he contend[ed] were available during the pendency of his lawsuit before Judge Jackson," Jacobsen v. Oliver, 451 F. Supp. 2d at 183, and he argued that defendants breached their fiduciary duty of loyalty by charging an unreasonable fee and violating certain ethical rules. See id. at 200-01.  On September 8, 2006, this Court dismissed all of these claims except the breach of fiduciary duty claim.  See id. at 187-200.  The Court ordered the parties to engage in settlement negotiations with respect to that claim.  See id. at 201.

The parties were unable to settle the fiduciary duty claim.  On July 17, 2007, defendants moved for summary judgment on that claim, arguing that (1) only the law firm is a proper defendant in this dispute, and (2) the contingent fee is reasonable.  Defendants also argue that (3) the fee issue is now *res judicata* because, as discussed below, Judge Jackson entered a charging lien in defendants' favor in Cicippio II.  Mr. Jacobsen disputes all three points, and further contends that (1) the parties' Contract is void as contrary to public policy, and thus Mr. Jacobsen should not be required to pay the contingent fee, and (2) defendants breached their fiduciary duty of loyalty in myriad ways, all of which require full or partial disgorgement of the fee.[4]  The Court concludes that plaintiff has failed to identify a genuine dispute of material fact necessitating trial, and therefore enters summary judgment in favor of defendants.

---

[4]       The only form of relief sought by Mr. Jacobsen is the equitable remedy of disgorgement.  See Pl.'s Supp. at 9.  For that reason, Mr. Jacobsen does not seek a jury trial.  See id.; see also Ginberg v. Tauber, 678 A.2d 543, 548-51 (D.C. 1996); Kudon v. f.m.e. Corp., 547 A.2d 976, 979 (D.C. 1988).

## II.  SUMMARY JUDGMENT STANDARD

Summary judgment may be granted only if "the pleadings, the discovery and disclosure materials on file, and any affidavits [or declarations] show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986); Holcomb v. Powell, 433 F.3d 889, 895 (D.C. Cir. 2006).  "A fact is 'material' if a dispute over it might affect the outcome of a suit under the governing law; factual disputes that are 'irrelevant or unnecessary' do not affect the summary judgment determination."  Holcomb v. Powell, 433 F.3d at 895 (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. at 248).  An issue is "genuine" if the evidence is such that a reasonable factfinder could return a verdict for the non-moving party.  See Anderson v. Liberty Lobby, Inc., 477 U.S. at 248; Holcomb v. Powell, 433 F.3d at 895.  When a motion for summary judgment is under consideration, "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [his or her] favor."  Anderson v. Liberty Lobby, Inc., 477 U.S. at 255; see also Mastro v. Potomac Electric Power Co., 447 F.3d 843, 849-50 (D.C. Cir. 2006); Aka v. Washington Hospital Center, 156 F.3d 1284, 1288 (D.C. Cir. 1998) (en banc); Washington Post Co. v. Dep't of Health and Human Services, 865 F.2d 320, 325 (D.C. Cir. 1989).  On a motion for summary judgment, the Court must "eschew making credibility determinations or weighing the evidence."  Czekalski v. Peters, 475 F.3d 360, 363 (D.C. Cir. 2007).

The non-moving party's opposition, however, must consist of more than mere unsupported allegations or denials and must be supported by affidavits, declarations or other competent evidence, setting forth specific facts showing that there is a genuine issue for trial.

FED. R. CIV. P. 56(e); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).  He is required to

provide evidence that would permit a reasonable factfinder to find in his favor.  Laningham v.

U.S. Navy, 813 F.2d 1236, 1242 (D.C. Cir. 1987).  If the non-movant's evidence is "merely

colorable" or "not significantly probative," summary judgment may be granted.  Anderson v.

Liberty Lobby, Inc., 477 U.S. at 249-50; see Scott v. Harris, 127 S. Ct. 1769, 1776 (2007)

("[W]here the record taken as a whole could not lead a rational trier of fact to find for the non-

moving party, there is 'no genuine issue for trial.'") (quoting Matsushita Electric Industrial Co. v.

Zenith Radio Corp., 475 U.S. 574, 587 (1986)).  To defeat a motion for summary judgment, a

plaintiff must have more than "a scintilla of evidence to support [his] claims."  Freedman v. MCI

Telecomm. Corp., 255 F.3d 840, 845 (D.C. Cir. 2001).

## III.  DISCUSSION

### A.  Choice of Law

Both parties assume that the Court should apply District of Columbia law to Mr.

Jacobsen's claims that the Contract is unenforceable and that defendants breached their duty of

loyalty.  See Firm Mot. at 4-10; Firm Mot. Opp. at 4-8.  The Court is under no obligation to

question these assumptions, and so it will assume that District of Columbia law applies to the

issues addressed in this Opinion.  See CSX Transp., Inc. v. Commercial Union Ins. Co., 82 F.3d

478, 482-83 (D.C. Cir. 1996) (parties may waive choice of law arguments); In re Korean Air

Lines Disaster of Sept. 1, 1983, 932 F.2d 1475, 1495 (D.C. Cir. 1991) (courts need not address

choice of law questions sua sponte).[5]

---

[5]      It is worth noting that the parties' assumption is almost certainly correct.
Defendants represented Mr. Jacobsen in proceedings that occurred in the District of Columbia,

### B. Is the Fee Issue Res Judicata?

As noted above, defendants argue that a decision has been made on the issue of the fee's reasonableness which is *res judicata* and it therefore cannot be revisited now. According to defendants, after Mr. Jacobsen sent defendants a letter discharging them as his counsel on April 4, 2000 – that is, after entry of judgment in Mr. Jacobsen's favor in Cicippio II – defendants successfully moved for a charging lien before Judge Jackson. See Firm Mot. at 2-4.[6] Defendants apparently believe that Judge Jackson decided the issue of the fee's reasonableness when he granted defendants a lien in the amount contemplated by the parties' contingent fee agreement. See id. at 2. The Court disagrees.

---

and for that reason the District of Columbia probably has the greatest interest in the lawfulness of the parties' Contract and defendants' behavior. See, e.g., Chandler v. W.E. Welch & Assocs., Inc., No. 06-794, 2008 WL 312454, at *6-7 (D.D.C. Feb. 5, 2008) (in a diversity action, a federal district court applies the choice of law principles of the state or jurisdiction in which the court sits; the District of Columbia employs a modified governmental interest analysis, under which the district court determines which jurisdiction's policy would be most advanced by having its laws applied to the facts in the case).

[6]     In his Order granting the lien, Judge Jackson stated:

> [I]t is hereby ORDERED and DECREED that any and all monies made available to plaintiff, David P. Jacobsen, to satisfy the judgment previously rendered against the Islamic Republic of Iran in this case, from any source, be paid directly to counsel for plaintiffs for distribution, less attorneys' fees of thirty-five percent and costs. It is further ORDERED that a charging lien is entered in favor of petitioner, Murphy, Oliver, Caiola & Gowen, P.C. against said monies in the amount of thirty-five percent of the judgment, as agreed upon in the contingency agreement entered into between petitioner and plaintiff, David P. Jacobsen.

Cicippio II, Civil Action No. 96-1805, Order (D.D.C. Oct. 12, 2000).

As the D.C. Circuit has explained:

> Under the claim preclusion aspect of *res judicata*, a final judgment on the merits in a prior suit involving the same parties or their privies bars subsequent suits based on the same cause of action. . . . Claim preclusion prevents parties from relitigating issues they raised or could have raised in a prior action on the same claim.

NextWave Personal Communications Inc. v. FCC, 254 F.3d 130, 143 (D.C. Cir. 2001) (citation and internal quotation marks omitted).  The doctrine of *res judicata* may bar a claim if: (1) there was a final judgment on the merits in the first action; (2) the present claim is the same as a claim that was raised or that might have been raised in the first proceeding; and (3) the party against whom *res judicata* is asserted was a party or in privity with a party in the previous case.  See Jacobsen v. Oliver, 201 F. Supp. 2d at 102-03.

Judge Jackson's Order did not address the validity of the underlying Contract, the reasonableness of the fee, or any other arguments for reducing or eliminating the fee.  Thus, his Order granting the charging lien is not a "final judgment on the merits" with respect to Mr. Jacobsen's claims.  Moreover, defendants concede that the parties to Cicippio II and the parties to this action are not identical.  See, e.g., Firm Mot. at 3.  Defendants' invocation of the doctrine of *res judicata* therefore fails.  See Jacobsen v. Oliver, 201 F. Supp. 2d at 103.

### C.  Plaintiff's Contract Claims

Mr. Jacobsen argues that the Contract he signed with defendants – including the clause providing for a 35% fee in the event of recovery – is contrary to public policy and therefore void and unenforceable.  See Firm Mot. Opp. at 8-11.  Mr. Jacobsen claims that the Contract is contrary to public policy because (1) it includes a clause requiring him to seek

8

defendants' consent before accepting a settlement offer (thereby violating the public policies

embodied in D.C. Rule of Professional Conduct 1.2(a)), see Firm Mot. Opp. at 9; (2) it includes a

clause requiring him to pay all fees and costs before discharging defendants (thereby violating the

public policies embodied in D.C. Rule of Professional Conduct 1.16(a)(3)), see id.; and (3) it

contemplates lobbying services (thereby violating the District of Columbia's public policy

against contingent fee contracts for certain lobbying services).  See id. at 10-12.

      It is accepted law that "[a] promise or other term of an agreement is unenforceable

on grounds of public policy if . . . the interest in its enforcement is clearly outweighed in the

circumstances by a public policy against the enforcement of such terms."  RESTATEMENT

(SECOND) OF CONTRACTS § 178 at 6 (1981).  This general rule applies to contingent fee contracts

between attorneys and their clients.  See, e.g., Brown v. Gessellschaft Fur Drahtlose Telegraphie,

104 F.2d 227, 229 (D.C. Cir. 1939) ("Brown II") (declaring contingent fee agreement void

because it contemplated lobbying activities contrary to public policy); Chang v. Louis &

Alexander, Inc., 645 A.2d 1110, 1116 n.11 (D.C. 1994) (champertous fee agreement void as

against public policy); Marshall v. Bickel, 445 A.2d 606, 609 (D.C. 1982) (declaring contingent

fee agreement void as champertous).  Here, however, plaintiff has failed to identify any plausible

reason for regarding the parties' Contract as contrary to public policy and hence unenforceable.

1.  Impermissible Clauses

Mr. Jacobsen complains of two particular clauses in the Contract: (1) a clause requiring him to obtain defendants' consent before accepting a settlement offer, and (2) a clause requiring him to pay all fees and costs before discharging defendants.  <u>See</u> Contract at 1.[7]  It certainly is true that the former clause could not be enforced in light of D.C. Rule of Professional Conduct 1.2(a), while the latter could not be enforced in light of D.C. Rule of Professional Conduct 1.16(a)(3).  <u>Cf.</u> Plaintiff David P. Jacobsen's Statement Pursuant to Local Rule 7.1(h) of Material Facts As To Which There Exists a Genuine Issue in Dispute, Ex. 1, Expert Report of David N. Webster at 14-15 (July 15, 2002) ("First Webster Report").[8]  But Mr. Jacobsen is making a different argument.  He argues that the mere presence of these two clauses in the Contract – not an attempt to enforce the clauses – renders the entire Contract contrary to public policy and hence unenforceable.  <u>See</u> Firm Mot. Opp. at 9-10.

The Court disagrees for two reasons.  First, Mr. Jacobsen cites no authority for the proposition that the mere presence of clauses that *would, if enforced or sought to be enforced,* violate Rules of Professional Conduct renders all other clauses in an otherwise valid contract void and unenforceable.  In <u>Barnes v. Quigley</u>, 49 A.2d 467 (D.C. 1946), the case on which Mr.

---

[7]     Specifically, the Contract provides that (1) "no claims may be settled in any manner without the written consent of Murphy & Oliver, P.C.," and (2) "employment of Murphy & Oliver, P.C., cannot be terminated until all compensation and costs have been paid by the undersigned client."  Contract at 1.

[8]     Rule 1.2(a) provides, in pertinent part, that "[a] lawyer shall abide by a client's decision whether to accept an offer of settlement of a matter."  D.C. R. PROF'L CONDUCT 1.2(a).

Rule 1.16(a)(3) provides, in pertinent part, that "a lawyer . . . shall withdraw from the representation of a client if . . . [t]he lawyer is discharged."  D.C. R. PROF'L CONDUCT 1.16(a)(3).

Jacobsen primarily relies, the District of Columbia Court of Appeals concluded that a clause resembling the right-to-settle clause at issue here would have been unenforceable *if* the attorney-plaintiff had sought to enforce it against his client. See Barnes v. Quigley, 49 A.2d at 468.

In this case, defendants are not asking the Court to enforce either clause – nor have they ever sought to enforce either clause, or invoked or relied upon either clause at any time during the course of their representation of Mr. Jacobsen. With respect to the right-to-settle clause, all acknowledge that "[t]here was no settlement offer from Iran, nor was there ever a settlement overture of any kind" – so there was never an opportunity to invoke the right-to-settle clause. Defs.' Reply at 6. With respect to the right-to-discharge clause, defendants argue, and Mr. Jacobsen does not dispute, that after Mr. Jacobsen received a favorable judgment in Cicippio II, he sent a termination letter to defendants on April 4, 2000, and a letter informing Judge Jackson of the discharge on May 5, 2000. Soon after sending these letters, he apparently engaged new counsel. See Defs.' Reply at 6-7 n.3. Defendants did not attempt to enforce the right-to-discharge clause before or after Mr. Jacobsen sent the termination letters. See Defs.' Supp. at 5-6. In other words, Mr. Jacobsen was neither discouraged nor prevented from terminating defendants (or engaging new counsel) by the right-to-discharge clause.[9] Thus, the right-to-settle clause and the right-to-discharge clause make the Contract contrary to public policy only in the most academic sense – that is, enforcement of the Contract, or an attempt to enforce it, *could have* violated public policy *if* these clauses had been invoked or *if* they had had some effect on

---

[9]     It is true that defendants did not formally withdraw from their representation of Mr. Jacobsen. See *infra* at 29-30. But as the recitation of facts above makes clear, notwithstanding that failure, Mr. Jacobsen was able to *effectively* terminate defendants and obtain new counsel. There was no violation of the public policies embodied in Rule 1.16(a)(3).

the parties' behavior.  But as they were steadfastly ignored by all of the parties, the mere presence

of these clauses does not render the entire Contract void.

 In any event, even if defendants were seeking to enforce the right-to-settle and

right-to-discharge clauses, those two clauses could be severed from other lawful clauses in the

Contract.  See Ellis v. James V. Hurson Associates, Inc., 565 A.2d 615, 617-18 (D.C. 1989)

("Where less than all of an agreement is unenforceable . . . a court may nevertheless enforce the

rest of the agreement in favor of a party who did not engage in serious misconduct.") (internal

quotation marks and citation omitted); see also RESTATEMENT (THIRD) OF THE LAW GOVERNING

LAWYERS § 34 cmt. g. (2000) (noting that "[w]hen only certain parts of a contract between client

and lawyer contravene the law . . . the lawful parts [generally] remain enforceable").  Unlawful

clauses may be severed if (1) they are not "essential part[s] of the agreed exchange," (2) the

parties seeking to enforce them did not engage in any "serious misconduct," and (3) the terms in

question were obtained "in good faith and in accordance with reasonable standards of fair

dealing."  RESTATEMENT (SECOND) OF CONTRACTS § 184 (1981).

 As discussed above, see supra at 10-11, the parties' behavior clearly indicates that

the two clauses at issue were not essential parts of the bargain.  As discussed below, see infra at

13-30, the defendants did not engage in any serious misconduct or obtain the fee terms in bad

faith.  As a result, even if defendants were seeking to enforce these two clauses, the Court could

refuse to do so and enforce only the Contract's lawful clauses – including the contingent fee

clause.  See infra at 18-23.[10]

---

[10] Mr. Jacobsen relies on Jones v. Feiger, Collison & Killmer, 903 P.2d 27 (Colo.
Ct. App. 1994) to resist this conclusion.  In that case, the Colorado Court of Appeals reviewed a
contingent fee agreement between an attorney and a client that included clauses similar to the

2.  Lobbying

Mr. Jacobsen also argues that this Court should void the Contract because it constitutes an impermissible contingent fee contract for lobbying services.  See Firm Mot. Opp. at 10-11.  At the very least, Mr. Jacobsen maintains, there are triable issues of fact as to whether (1) the parties initially intended to contract for illegal lobbying services, and (2) the defendants orally modified the Contract after execution by choosing to engage in lobbying.  Id. at 11-12. The Court disagrees for several reasons.

*a.  Plain Language*

As an initial matter, Mr. Jacobsen offers no evidence to support the contention that the parties intended to contract for lobbying services, improper or otherwise.  The Contract on its face certainly does not suggest that they did.  See Contract at 1-2.  Nor does the Court

---

right-to-settle clause and the right-to-discharge clause described above.  See id. at 29.  The court first concluded that "*these provisions* of the agreement are unenforceable as against public policy" because they impermissibly limited the client's right to settle his case.  Id. at 34 (emphasis added).  The court went on to hold that the clauses in the contract governing calculation of fees were also unenforceable, reasoning that the unlawful clauses were "inextricably intertwined" with, and hence not severable from, the otherwise lawful clauses governing calculation of fees.  Id.

This Court disagrees with the reasoning of Jones insofar as that case suggests that clauses "pertain[ing] to the consequences to the client of accepting or refusing settlement" are never severable from fee clauses in the same contract.  Were it true, as the Jones court implies, that such clauses are "inextricably intertwined" with fee clauses merely because both "are part of the consideration for the agreement of the law firm to provide legal services," Jones v. Feiger, Collison & Killmer, 903 P.2d at 35, then unlawful clauses could *never* be severed from lawful fee clauses in attorney-client engagement contracts.  This strikes the Court as an unwise rule which the Court will not follow.  The Court will instead follow the Restatement, which permits unlawful clauses to be severed provided they are not "essential" aspects of the consideration for the agreement and the agreement is not tainted by serious misconduct or unfair bargaining. RESTATEMENT (SECOND) OF CONTRACTS § 184 (1981).

13

agree with plaintiff that the terms of the Contract are "broad enough to embrace the notion that

the parties contracted and indeed contemplated the need for Defendants to lobby to achieve

ultimate collection of a favorable judgment." Firm Mot. Opp. at 11.[11]  The express terms of the

Contract indicate that Mr. Jacobsen bargained for legal services, not lobbying services, <u>see</u>

Contract at 1, and plaintiff offers no reason to believe that the terms were intended to have

anything but their ordinary meaning.  <u>See</u>, <u>e.g.</u>, <u>Mesa Air Group, Inc. v. Dep't of Transp.</u>, 87 F.3d

498, 503 (D.C. Cir. 1996) ("[W]hen the language of a contract is clear and unambiguous on its

face, a court will assume that the meaning ordinarily ascribed to those words reflects the

intention of the parties.").  The Court cannot conclude that the Contract is an unlawful contract

for the procurement of legislation because the plain language of the Contract clearly indicates

that it is a contract for the performance of legal services.

### b.  Oral Modification

The Court also rejects plaintiff's oral modification argument.  Even if the parties

did modify the Contract by their words or conduct such that it comprehended lobbying services

of some sort, the undisputed facts establish that the Contract would not be rendered void by such

modification.  While under some circumstances courts will invalidate contingent fee agreements

for lobbying services, <u>see</u> <u>Luff v. Luff</u>, 267 F.2d 643, 646 (D.C. Cir. 1959); <u>Le John Mfg. Co. v.</u>

---

[11]     The Contract provides, in pertinent part, that

> [Jacobsen] hereby retains . . . Murphy & Oliver, P.C., as counsel to
> institute suit, adjust or settle claims or actions as they may deem
> advisable to recover for damages; hereby giving the said attorneys
> the right to take all legal steps to enforce said claims.

Contract at 1.

Webb, 222 F.2d 48, 51-52 (D.C. Cir. 1955), not "all contingent fee contracts . . . for the procuring of legislation [are] void as against public policy." Gessellschaft Fur Drahtlose Telegraphie v. Brown, 78 F.2d 410, 413 (D.C. 1935) ("Brown I"); see also Brown II, 104 F.2d at 229. In general, otherwise lawful contingent fee contracts for the procuring of "debt" legislation are not disfavored, while contingent fee contracts for the procuring of "favor" legislation are disfavored. See, e.g., Brown II, 104 F.2d at 229; State v. Okanogan County, 280 P. 31, 36-37 (Wash. 1929); cf. Le John Mfg. Co. v. Webb, 222 F.2d at 51-52.[12] Debt legislation is legislation that "provides means for settlements of debts or obligations founded either upon contract or violation of a generally recognized legal right." Hollister v. Ulvi, 271 N.W. 493, 498 (Minn. 1937); see also State v. Okanogan County, 280 P. at 36-37 (debt legislation fulfills debts based on a "sufficient equitable and moral foundation"). Favor legislation, in contrast, is legislation that grants "favors through contracts from the heads of governmental departments . . . or [grants] advantages or benefits to which, prior to the enactment," the person seeking the legislation had no cognizable claim. Brown I, 78 F.2d at 413; see also Brown II, 104 F.2d at 229.

Here, the undisputed facts are that any lobbying undertaken by defendants was in pursuit of debt legislation, not favor legislation. From the outset of this case, all recognized that Mr. Jacobsen had colorable claims against Iran based on "violation[s] of a generally recognized legal right" and/or "sufficient equitable and moral foundation[s]." Those claims, however, were

---

[12]    An important consideration in determining whether contingent fee contracts for the procuring of debt legislation are "otherwise lawful" is whether such contracts contemplate or invite the use of improper means of influencing legislators. See Trist v. Child, 88 U.S. 441, 449-50 (1874). Here, the Contract does not suggest – and Mr. Jacobsen has offered no evidence tending to show – that defendants' incidental pursuit of legislation on his behalf included or was intended to include improper "personal solicitation" rather than "purely professional services." Id. at 450.

foreclosed by the immunity conferred on Iran by the Foreign Sovereign Immunities Act.  Thus,

Mr. Jacobsen and his allies – including defendants – pressed Congress to remove this obstacle.

Congress eventually did so, allowing Mr. Jacobsen to secure a judgment against Iran in Cicippio

II.  At that point, Mr. Jacobsen indisputably had a valid legal claim in need of satisfaction – that

is, a debt.  Cf. Hollister v. Ulvi, 271 N.W. 2d at 499-500.  When it became clear that legislation

would also be needed to satisfy that debt, both parties again encouraged Congress to make Mr.

Jacobsen whole.  Ultimately, this effort resulted in the VTVPA and the satisfaction of Mr.

Jacobsen's debt.  Thus, to the extent that defendants engaged in lobbying activities, they were

lobbying for forms of debt legislation.  The law does not frown on contingent fee contracts for

otherwise lawful lobbying services the purpose of which is to procure such legislation.  See

Brown II, 104 F.2d at 229.  The Court therefore concludes that there is no genuine factual dispute

as to whether the Contract is void as contrary to public policy even if it does comprehend some

incidental lobbying services.

   The bottom line is this: Mr. Jacobsen sought legal services and signed a contract

for such services.  Defendants provided legal services as called for by that contract.  Defendants

also, it appears, pursued some lobbying efforts – but these efforts were incidental to and intended

to effectuate their litigation efforts.  Indeed, the record indicates that defendants engaged in

lobbying only to the extent necessary to accomplish very specific litigation goals; they lobbied in

order to allow Mr. Jacobsen to proceed with his claim, and they lobbied in order to secure a

monetary award for Mr. Jacobsen once he prevailed on that claim.  Moreover, there is no

indication that the Contract anticipated the use of improper solicitation of members of Congress,

or that defendants engaged in such conduct.  Under these circumstances, there simply is no

genuine dispute that the Contract before the Court is – and was treated as – a valid contract for *legal* services.  The Court declines Mr. Jacobsen's invitation to focus on activities that were ancillary to the primary purpose of the Contract in order to allow him to escape his contractual obligations.

### D.  Plaintiff's Fiduciary Duty Claims

Mr. Jacobsen also contends that defendants breached the duty of loyalty that attorneys owe to their clients, and that some or all of defendants' fee should be disgorged for that reason.  See Firm Mot. Opp. at 12-15.  According to Mr. Jacobsen, defendants breached their fiduciary duty by (1) charging an unreasonable and excessive fee in violation of D.C. Rule of Professional Conduct 1.5(a), and (2) violating various other ethical rules.  See Firm Mot. Opp. at 2, 12-14; Pl.'s Supp. at 3-7.[13]  At the very least, Mr. Jacobsen maintains, "whether [defendants'] pattern of violation of ethical duties is sufficiently continuous, grave or injurious to Plaintiff and the public [to suggest that defendants breached their fiduciary duty of loyalty, and therefore to support disgorgement,] gives rise to triable issues of fact."  Firm Mot. Opp. at 15.  The Court disagrees, and therefore enters summary judgment in favor of defendants on all of Mr. Jacobsen's fiduciary duty claims.

---

[13]     Mr. Jacobsen also maintains that defendants breached their duty of loyalty by tardily seeking *pro hac vice* admission and neglecting to inform Mr. Jacobsen as to whether each defendant was licensed to practice law in the District of Columbia at the outset of the representation.  See Firm Mot. Opp. at 14.  As discussed at oral argument, the Court regards these arguments as frivolous and will not address them further.

1.  Reasonableness of the Fee

Mr. Jacobsen argues that the 35% contingent fee collected by defendants was so excessive as to amount to a violation of D.C. Rule of Professional Conduct 1.5(a) and a breach of defendants' fiduciary duty of loyalty.  See Pl.'s Supp. at 3-4.[14]  Notably, plaintiff seems to concede that the fee arrangement was reasonable when first executed, but argues that changed circumstances rendered it unreasonable.  Specifically, plaintiff argues that Iran's decision not to appear in Cicippio II rendered the agreement unreasonable because it drastically reduced the amount of work required of defendants.  See Firm Mot. Opp. at 20 (arguing that "what the parties thought would be a contested case when their bargain was entered into turned out to be entirely uncontested").

Plaintiff also argues that defendants' decision to pursue legislation to permit Mr. Jacobsen to collect his Cicippio II judgment rendered the fee unreasonable.  This argument is not entirely clear, but it appears to be based on the idea that since both Mr. Jacobsen and defendants engaged in lobbying, it is unreasonable to allow defendants to retain the entire fee.  See Firm Mot. Opp. at 20 (arguing that "even if [defendants' lobbying activities do not void the contract], there exists a genuine dispute of material facts as to how much lobbying by Defendants produced the desired result, as opposed to Plaintiff's own lobbying and the efforts of others lobbying for clients other than Plaintiff").  Defendants respond that they are entitled to summary judgment on this claim because the undisputed facts establish that plaintiff willingly agreed to the fee

---

[14]     Rule 1.5(a) provides, in pertinent part, that "[a] lawyer's fee shall be reasonable." D.C. R. PROF'L CONDUCT 1.5(a).

18

agreement, and that the fee was reasonable throughout the representation, particularly in light of the substantial risk of non-payment defendants bore at all times.  See Firm Mot. at 4.

"A lawyer may not charge a fee larger than is reasonable in the circumstances or that is prohibited by law."  RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 34 (2000).  An attorney who charges an excessive and unreasonable fee violates both the District of Columbia's ethical rules, see D.C. R. PROF'L CONDUCT 1.5, and, in some circumstances, the common law fiduciary duty of loyalty.  Generally speaking, the Court is to consider three factors in assessing the reasonableness of any fee: (1) "when the contract was made, did the lawyer afford the client a free and informed choice?"; (2) "does the contract provide for a fee within the range commonly charged by other lawyers in similar representations?"; and (3) "was there a subsequent change in circumstances that made the fee contract unreasonable?"  RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 34 (2000).  See also Jacobsen v. Oliver, 201 F. Supp. 2d at 103.

Section 35 of the Restatement of the Law Governing Lawyers specifically addresses the reasonableness of contingent fees.  According to Section 35, "[a] contingent fee may permissibly be greater than what an hourly fee lawyer of similar qualifications would receive for the same representation," because "[a] contingent-fee lawyer bears the risk of receiving no pay if the client loses and is entitled to compensation for bearing that risk."  RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 35 cmt. c. (2000).  Section 35 further explains that "[a] tribunal will find a contingent fee unreasonable due to a defect in the calculation of risk in two kinds of cases in particular: those in which there was a likelihood of substantial recovery by trial or settlement, so that the lawyer bore little risk of nonpayment; and

19

those in which the client's recovery was likely to be so large that the lawyer's fee would clearly

exceed the sum appropriate to pay for services performed and risks assumed." Id.  The D.C.

Rules of Professional Conduct similarly address the "reasonableness" inquiry in terms of risk.

They include among the factors to be considered "[t]he time and labor required, the novelty and

difficulty of the questions involved, and the skill requisite to perform the legal service properly."

D.C. R. PROF'L CONDUCT 1.5(a)(1); see also ABA MODEL R. PROF'L CONDUCT 1.5(a)(1).  The

D.C. Rules of Professional Conduct also explicitly permit contingent fees.  See D.C. R. PROF'L

CONDUCT 1.5(c); see also ABA MODEL R. PROF'L CONDUCT 1.5(c).  The ABA's annotated

Model Rules include examples of permissible contingent fee agreements similar to or in excess

of 35%.  See ABA ANNOTATED MODEL R. PROF'L CONDUCT at 74-75 (5th ed. 2003) (citing cases

upholding contingency fees of 33%, 40% and 50%).

### a.  Plaintiff Freely Entered Into the Contract

There is no genuine dispute as to whether plaintiff's consent to the fee agreement

was free and informed.  Plaintiff has stated as much with respect to both the 1992 and the 1996

contracts.  See Jacobsen Dep. at 118-22 ("Q: You understood, Mr. Jacobsen, that by signing and

returning the [1992 engagement letter], you were agreeing that in the event you were awarded

and collected money damages as a result of the lawsuit that Mr. Oliver and his firm would

receive 35 percent of the award as the fee for their services; is that right? . . . A: Yes, but I also

understood that that contract was that I would get skilled legal representation."); id. at 170-73

("Q: I'd like to mark as Defendants' Exhibit 10, contingent fee agreement executed, it would

appear by Mr. Jacobsen on July 18, 1996.  Is Defendants' Exhibit 10 the contingency agreement

that you signed retaining the firm of Murphy and Oliver as your counsel?  A: That is my

signature . . . .  That is the agreement.  Q: Did you read this agreement before you signed it?

A: Yes, I did. . . . Q: Did you have any questions about it?  A: No, I probably did not.").[15]

### b. The Percentage Is Within the Range Commonly Charged

There is no genuine dispute as to whether a 35% contingency fee is "within the

range commonly charged by other lawyers in similar representations."  RESTATEMENT (THIRD)

OF THE LAW GOVERNING LAWYERS § 34 (2000).  This point is acknowledged by both plaintiff's

expert, David Webster, and defendants' expert, Barry Nace.  See Defendants' Response to

Plaintiff's Statement of Material Facts As To Which There Exists a Genuine Dispute, Ex. 36,

Deposition of David N. Webster, Esq. at 25-26 (Sept. 12, 2002) ("Webster Dep."); Firm Mot.,

Ex. I, Expert Opinion of Barry J. Nace at 3 (undated) ("Nace Report").  Mr. Webster nevertheless

argues that the fee is unreasonable when evaluated in light of the criteria set forth in D.C. Rule of

Professional Conduct 1.5.  See First Webster Report at 16-19.  But Mr. Webster's opinion does

not create a genuine dispute about the fee's reasonableness for two reasons.

First, Mr. Webster's opinion proceeds from a faulty assumption.  As defendants

point out, see Firm Mot. at 9-10, Mr. Webster's conclusion that the fee is unreasonable is based

---

[15]     Only plaintiff's expert, David Webster, suggests that plaintiff's consent to the
contract was not free and informed.  Mr. Webster reasons that plaintiff's consent was not free
and informed because plaintiff believed he was signing a standard and proper agreement which
was in fact not standard and proper, because it included two provisions that violated the D.C.
Rules of Professional Conduct, and because it failed to include at least one other provision
mandated by the Rules.  See First Webster Report at 16.  Mr. Webster's opinion does not create a
genuine dispute as to whether plaintiff's agreement was free and informed because Mr.
Webster's opinion does not address whether plaintiff understood the *contingent fee clause* – the
real bone of contention here.

primarily on his view that the fee is disproportionate to the number of hours worked.  See First

Webster Report at 17.  But such reasoning makes little sense in this context.  As Mr. Webster

acknowledges, see id. at 19, contingent fee arrangements are *intended* to generate relatively large

fees in successful cases, because firms who utilize contingent fee arrangements must compensate

for unsuccessful cases in which no fees are generated.  See also RESTATEMENT (THIRD) OF THE

LAW GOVERNING LAWYERS § 35 cmt. c. (2000); Drew C. Phillips, Contingency Fees: Rules and

Ethical Guidelines, GEORGETOWN J. OF LEGAL ETHICS 233, 236-237 (Winter 1998).  In essence,

Mr. Webster's opinion (unhelpfully) evaluates the contingent fee at issue as if it were an hourly

fee.[16]

Second, Mr. Webster candidly admits that his opinion is not rooted in community

or professional standards.  See First Webster Report at 17 (acknowledging that he has "no

reliable data on what is being charged by other lawyers who are handling [similar] cases").[17]

That being the case, this Court cannot regard Mr. Webster's opinion as "significantly probative"

evidence of the fee's reasonableness.  Anderson v. Liberty Lobby, Inc., 477 U.S. at 249-50.  In

---

[16]     Oddly enough, Mr. Webster's one reference to the contingent nature of the fee
supports *defendants'* arguments.  See First Webster Report at 19 ("This being a contingent fee
one would expect that a higher fee structure would be present than a usual hourly rate in order to
compensate the lawyers for the possibility of no recovery at all.").

[17]     Mr. Webster does assert that attorney John J. McDermott, a veteran FSIA
litigator, has charged contingent fees lower than the fee at issue here.  See First Webster Report
at 16.  But it appears that Mr. McDermott began bringing FSIA suits against Iran only *after* the
1996 amendments to FSIA, which amended the law to permit suits against foreign states that
sponsor terrorism.  See Plaintiff David P. Jacobsen's Statement Pursuant to Local Rule 7.1(h) of
Material Facts As To Which There Exists a Genuine Issue in Dispute, Ex. 19, Affidavit of John
J. McDermott ¶ 2 (Dec. 24, 2001).  After the 1996 amendments, such suits obviously were far
less risky than they were when defendants initially agreed to take plaintiff's case in 1992.  The
Court therefore concludes that comparisons to Mr. McDermott's fees do not create a genuine
dispute about the reasonableness of defendants' fee.

light of its shortcomings, the Court concludes that Mr. Webster's opinion is, at best, "merely

colorable" evidence of the fee's unreasonableness – and "merely colorable" evidence is

insufficient to preclude summary judgment.  Id.

> ### c.  No Changes in Circumstances Rendered the Fee Unreasonable

Mr. Jacobsen points to two events which, in his view, rendered the Contract

unreasonable after he entered into it, therefore requiring defendants to modify the Contract: the

decision of Iran not to appear in Cicippio II, and defendants' decision to seek legislation to

satisfy plaintiff's Cicippio II judgment.  The Court already has indicated that the former event did

not render the fee unreasonable because it did not eliminate much of the risk associated with

defendants' representation of Mr. Jacobsen:

> Jacobsen contends that Iran's failure to appear in Cicippio II
> lessened the risk of an adverse judgment [and hence rendered the
> fee unreasonable]. . . .  At the time, however, Jacobsen appears to
> have understood that Oliver still faced numerous challenges [in
> obtaining a judgment in Jacobsen's favor]. . . .
>
> A second, even greater risk was also present: the risk of non-
> payment.  In fact, until the passage of the VTVPA in 2000 – four
> years after Jacobsen and Oliver entered into the contingent fee
> agreement at issue – there was little hope of collecting any
> judgment against Iran. . . .  Jacobsen's correspondence during this
> period seems to demonstrate his awareness of this fact. . . .  Thus,
> from the time the retainer agreement was signed until the passage
> of the VTVPA, as even Jacobsen seems to concede, the risk of
> non-payment was consistently and invariably high.

Jacobsen v. Oliver, 451 F. Supp. 2d at 201.  In other words, it is undisputed that Iran's failure to

defend did not transform this case into a case in which "there was a high likelihood of substantial

recovery . . . , so that the lawyer bore little risk of nonpayment," nor a case in which "the client's

recovery was likely to be so large that the lawyer's fee would clearly exceed the sum appropriate to pay for services performed and risks assumed."  RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 35 cmt. c. (2000).  Thus, there is no triable issue regarding whether Iran's failure to defend rendered the fee agreement unreasonable because there is no genuine dispute that defendants still bore a substantial risk of non-recovery even after Iran's decision not to appear.

  As noted above, see supra at 18, Mr. Jacobsen also appears to argue that because he engaged in lobbying services (or contributed to defendants' lobbying efforts), it is unreasonable to allow defendants to retain the entire fee.  Mr. Jacobsen does not point to any authority for this theory, and there does not appear to be any.  Thus, any disputes about "how much lobbying by Defendants produced the described result, as opposed to Plaintiff's own lobbying and the efforts of others lobbying for clients other than Plaintiff," Firm Mot. Opp. at 20, are immaterial.  Disputes about immaterial facts do not preclude summary judgment.  See Holcomb v. Powell, 433 F.3d at 895.

  In sum, the Court concludes that no reasonable trier of fact could conclude that defendants' fee was so excessive as to violate Rule 1.5(a) – let alone defendants' fiduciary duty of loyalty.  See Scott v. Harris, 127 S. Ct. at 1776 ("[W]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is 'no genuine issue for trial.'") (quoting Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. at 587).

2.  Other Alleged Breaches of Fiduciary Duty

Mr. Jacobsen argues that defendants' alleged violations of certain ethical rules amount to a breach of defendants' fiduciary duty and require full or partial disgorgement of defendants' fee.  Specifically, Mr. Jacobsen contends that defendants violated Rule 1.2(a) of the D.C. Rules of Professional Conduct by including the right-to-settle clause in the Contract; Rule 1.5(c) by failing to include clauses explaining payment of costs in case of no recovery and the method of calculating the contingency percentage in the Contract; and Rule 1.16(a)(3) by including the right-to-discharge clause in the Contract and refusing to acquiesce to termination. See Firm Mot. Opp. at 12-15; Pl.'s Supp. at 3-6, 8.  Mr. Jacobsen maintains, first, that these alleged "violations of the Professional Rules are indicative of [defendants'] breach of loyalty to the plaintiff," Pl.'s Supp. at 3, and second, that by offering evidence of these violations, he has created genuine disputes of material fact which permit his fiduciary duty claims to survive summary judgment.  The Court disagrees.

It is true that "[c]onduct by an attorney in derogation of the client's interest breaches the attorney's fiduciary duty," McElroy v. Robinson & Cole, LLP, No. 99-4677, 2001 WL 1319970 at *10 (Mass. Sup. Ct. Oct. 25, 2001), and that such breaches may justify the remedy of disgorgement.  See generally In re Hager, 812 A.2d 904 (D.C. 2002).  See also RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 37 (2000) ("A lawyer engaging in *clear and serious* violation of duty to a client may be required to forfeit some or all of the lawyer's compensation for the matter.") (emphasis added).  Under District of Columbia law, however, not *every* violation of *every* ethical rule constitutes a breach of fiduciary duty that requires disgorgement.  See Hendry v. Pelland, 73 F.3d 397, 401, 402 (D.C. Cir. 1996);

25

Television Capital Corp. v. Paxson Communications Corp., 894 A.2d 461, 469-70 (D.C. 2006).

Rather, certain kinds of violations of certain ethical rules may demonstrate that an attorney has

breached his fiduciary duty of loyalty, while others may not.  See id. at 469-70; see also Avianca,

Inc. v. Harrison, No. 94-7053, 1995 WL 650232, at *2 (D.C. Cir. Oct. 24, 1995) (not every

violation of an ethical rule necessarily results in a breach of fiduciary duty); Griva v. Davison,

637 A.2d 830, 846-47 (D.C. 1994) (violation of ethical rule does not necessarily create a

presumption that a legal duty has been violated).

       The Court concludes that the evidence of ethical violations offered here, even

when viewed in the light most favorable to Mr. Jacobsen, would not permit a reasonable trier of

fact to find that defendants breached their fiduciary duty of loyalty.  See Scott v. Harris, 127 S.

Ct. at 1776.  In other words, the Court concludes that even if all of Mr. Jacobsen's allegations are

believed, the further inference that defendants' minor, technical, and harmless violations of

ethical rules are indicative of a breach of fiduciary duty is simply not "justifiable."  Anderson v.

Liberty Lobby, Inc., 477 U.S. at 255.

### a. Rule 1.2(a)

       Rule 1.2(a) provides that "[a] lawyer shall abide by a client's decision whether to

accept an offer of settlement of a matter."  D.C. R. PROF'L CONDUCT 1.2(a).  Mr. Jacobsen argues

that defendants violated Rule 1.2(a) by "*attempting* to curtail through their written fee agreement

the client's sole decision-making authority as to settlement."  Pl.'s Supp. at 4-5 (emphasis

added).  This argument contains its own refutation.  Mr. Jacobsen implicitly acknowledges a

point made earlier, see *supra* at 11 – namely, that defendants never had an opportunity to curtail

26

Mr. Jacobsen's decision-making authority (because Iran never made a settlement offer), and thus

never failed to "abide by a client's decision whether to accept" a settlement.  D.C. R. Prof'l

Conduct 1.2(a).  Defendants therefore did not violate Rule 1.2(a).  Furthermore, no rational trier

of fact could conclude that the mere presence of the right-to-settle clause in the Contract

demonstrates a breach of fiduciary duty.  See Scott v. Harris, 127 S. Ct. at 1776; Anderson v.

Liberty Lobby, Inc., 477 U.S. at 255.

### b.  Rule 1.5(c)

Rule 1.5(c) provides that a contingent fee agreement

> shall be in writing and shall state the method by which the fee is to
> be determined, including the percentage or percentages that shall
> accrue to the lawyer in the event of settlement, trial, or appeal,
> litigation, other expenses to be deducted from the recovery,
> whether such expenses are to be deducted before or after the
> contingent fee is calculated, and whether the client will be liable
> for expenses regardless of the outcome of the matter.

D.C. R. Prof'l Conduct 1.5(c).  Mr. Jacobsen argues that defendants violated Rule 1.5(c)

because the Contract did not include (1) "provisions outlining the responsibility of the client for

payment of costs if there is no recovery," or (2) "provisions as to whether the contingency

percentage is computed before or after deduction of costs."  Firm Mot. Opp. at 14.

In fact, the Contract does address the former.  It provides that "*all* expenses

incident to the investigation, institution, prosecution, and trial of the case shall be borne by the

undersigned client." Contract at 1 (emphasis added).  It is true that this provision does not

specifically state that it applies even if there is no recovery, but the Court concludes that the

absolute language of the provision – requiring that all expenses will be paid by the client,

regardless of the outcome – is more than sufficient for purposes of Rule 1.5(c).[18]

The Contract does not address whether costs are to be deducted before or after the calculation of the contingent fee.  But under the circumstances of this case, no reasonable trier of fact could find that this omission demonstrates a breach of fiduciary duty.  After all, as defendants point out:

> Defendant Murphy Oliver calculated the fee without deducting the expenses, but then paid the expenses out of its own share.  *The result, for Jacobsen, was better than either situation contemplated by [Rule 1.5(c)]:* he received more money than he would have if the fee had been deducted before the calculation, and more money than he would have if the fee had been deducted after the calculation.

Defs.' Supp. at 3-4 (emphasis added).  Cf. Partee v. Compton, 653 N.E. 2d 454, 456 (Ill. App. Ct. 1995) (failure to include clause specifying timing of cost deduction did not justify reducing or eliminating attorneys' fees).  Thus, defendants' failure to include language about the timing of cost deduction does not permit a justifiable inference that defendants breached their fiduciary duty.  Anderson v. Liberty Lobby, Inc., 477 U.S. at 255.

### c.  Rule 1.16(a)(3)

Rule 1.16(a)(3) provides that "a lawyer . . . shall withdraw from the representation of a client if . . . [t]he lawyer is discharged."  D.C. R. PROF'L CONDUCT 1.16(a)(3).  Mr. Jacobsen maintains that defendants violated Rule 1.16(a)(3) in "refusing to acquiesce to the attempted

---

[18]     Alternatively, the Court concludes that no rational trier of fact could find that such a minor, technical violation of Rule 1.5(c) demonstrates a breach of fiduciary duty.  Cf. In re Thomas, 764 So. 2d 943, 944 (La. 2000) (failure to comply with technical requirements of ethical rule governing form of contingent fee contracts does not necessarily suggest breach of fiduciary duty).

termination by Plaintiff and by attempting to fetter, [by inclusion of the right-to-discharge clause], Plaintiff's freely-exercisable right to terminate Defendants." Pl.'s Supp. at 5. According to Mr. Jacobsen, these violations of Rule 1.16(a)(3) demonstrate a violation of the fiduciary duty of loyalty and justify disgorgement.

Refusing to withdraw – or attempting to enforce a right-to-discharge clause like the one included in the Contract – could constitute a violation of Rule 1.16(a)(3). See In re Roxborough, 775 A.2d 1063, 1068 (D.C. 2001). And of course, in some cases, a violation of Rule 1.16(a)(3) could also constitute a breach of fiduciary duty. But under the circumstances of this case, no reasonable trier of fact could find that defendants' behavior amounts to a breach of fiduciary duty.

After Mr. Jacobsen terminated them in April 2000, defendants took no action even remotely contrary to Mr. Jacobsen's interests and did not in any way interfere with his consultation with and retention of other counsel. To the extent that they did continue to represent Mr. Jacobsen's interests, defendants did so only in a way *consistent with* Rule 1.16 – comment 9 of which provides that "[e]ven if the lawyer has been unfairly discharged by the client, a lawyer must take all reasonable steps to mitigate the consequences to the client." D.C. R. Prof'l Conduct 1.16, cmt. 9.[19] Moreover, as discussed above, the undisputed facts establish that (1) defendants did not attempt to enforce the right-to-discharge clause against Mr. Jacobsen, and (2) the right-to-discharge clause did not discourage or prevent Mr. Jacobsen from terminating

---

[19] Specifically, it appears that the only action defendants took after they were terminated by Mr. Jacobsen was to file, on his behalf, a response to a government motion seeking to quash certain writs of execution which Mr. Jacobsen had previously filed in order to satisfy his judgment against Iran. See Firm Mot., Ex. C, Declaration of James J. Oliver, Esquire ¶ 55.

defendants and hiring new counsel.  See *supra* at 11.  Thus, while defendants may have

committed a technical violation of Rule 1.16(a)(3) by failing to formally withdraw, and while the

inclusion of the right-to-discharge clause in the Contract represents a *potential* violation of Rule

1.16(a)(3), under the circumstances of this case no reasonable trier of fact could justifiably

conclude that these alleged violations demonstrate a breach of fiduciary duty.  See Scott v.

Harris, 127 S.Ct. at 1776.

### d.  Plaintiff's Reliance on <u>Hendry v. Pelland</u>

Plaintiff contends that the conclusions above are precluded by <u>Hendry v. Pelland</u>,

73 F.3d 397 (D.C. Cir. 1996).  In <u>Hendry</u>, former clients sued their former attorney, Mr. Pelland,

for breach of fiduciary duty.  Plaintiffs contended that Mr. Pelland breached his duty of loyalty by

simultaneously representing various members of the Hendry family during a settlement

negotiation even though some of the family members had divergent interests.  See id. at 399,

401.  At the close of all of the evidence, the trial court granted judgment as a matter of law for

Mr. Pelland, and the plaintiffs appealed.  See id. at 400.  On appeal, the D.C. Circuit analyzed

whether the evidence that plaintiffs had proffered during trial was sufficient to send the fiduciary

duty claim to the jury under District of Columbia law.  The D.C. Circuit concluded that

testimony by plaintiffs' expert – testimony that tended to show that Mr. Pelland had violated the

then-operative rule of professional conduct prohibiting conflicts of interest – was sufficient "for a

reasonable jury to find that Pelland violated [the ethical rule], thereby breaching his fiduciary

duty of loyalty."  Id. at 401.

According to Mr. Jacobsen, <u>Hendry</u> holds that *any* evidence of *any* violation of

*any* ethical rule is "*ipso facto* sufficient to support a client's claim of common law breach of fiduciary duty."  Pl.'s Supp. at 2; <u>see</u> <u>also</u> <u>id</u>. ("When evidence of such an ethical violation exists, an attorney is deemed to have breached his fiduciary duty of loyalty.").  At the very least, Mr. Jacobsen contends, <u>Hendry</u> stands for the proposition that

> [s]ummary judgment or any other form of disposition as a matter of law, may not be entered in favor of a client who sues the attorney for breach of the duty of loyalty [if] there exists evidence of breaches of the D.C. Rules of Professional Conduct . . . .

<u>Id</u>. at 2.  The Court disagrees.

Mr. Jacobsen's absolutist reading of <u>Hendry</u> is unsupportable in light of that decision's careful, qualified language.[20]  Most importantly for this case, the <u>Hendry</u> court did not hold that *any* evidence of *any* violation of *any* ethical rule will defeat a motion for summary judgment on a fiduciary duty claim.  Rather, the <u>Hendry</u> court found that the plaintiffs in that case had presented evidence from which a reasonable juror could conclude that Mr. Pelland had violated the ethical rule prohibiting conflicts of interest, and that a reasonable juror could also draw a justifiable inference from the nature of that alleged violation that Mr. Pelland had breached his fiduciary duty of loyalty.  <u>See</u> <u>Hendry v. Pelland</u>, 73 F.3d at 401. This, of course, is a far cry from Mr. Jacobsen's view that any evidence of any ethical violation precludes summary judgment on a breach of fiduciary duty claim.

---

[20]     For example, the <u>Hendry</u> court took care to hold that a violation of an ethical rule "*can* constitute a breach of the attorney's common law fiduciary duty to the client" – not that it always does.  <u>Hendry v. Pelland</u>, 73 F.3d at 401 (emphasis added); <u>see</u> <u>also</u> <u>id</u>. (District of Columbia law recognizes that "ethical duties are [not] co-extensive with an attorney's fiduciary duties").  Moreover, the <u>Hendry</u> court limited its analysis to alleged violations of one particular ethical rule.  <u>See</u> <u>Hendry v. Pelland</u>, 73 F.3d at 402 ("[W]e have not considered whether violations of two other ethical rules mentioned by the Hendry's expert . . . can also constitute breaches of an attorney's common law fiduciary duties.").

This case is like <u>Hendry</u> in that Mr. Jacobsen has offered evidence of alleged ethical violations on the part of his attorneys and argued that those alleged violations indicate a breach of fiduciary duty.  This case is unlike <u>Hendry</u> in that, even when viewed in the light most favorable to Mr. Jacobsen, and even when all *justifiable* inferences are drawn in his favor, the evidence he has offered simply would not permit a reasonable trier of fact to find that defendants breached their fiduciary duty of loyalty.  <u>Hendry</u> therefore does not preclude summary judgment in favor of defendants here.

For the reasons stated in this Opinion, on March 28, 2008 the Court granted summary judgment in favor of defendants on all of plaintiff's claims.[21]

SO ORDERED.

/s/_____
PAUL L. FRIEDMAN
United States District Judge

DATE: May 16, 2008

---

[21]     This disposition makes it unnecessary to consider the parties' arguments about whether Mr. Jacobsen's claim runs against all of the individual defendants as well as the defendants' law firm.  <u>See</u>, <u>e.g.</u>, Individ. Mot. at 2-3; Individ. Mot. Opp. at 2-4.